# Hartman *versus* Keystone Insurance Company.

1. Where the object of a defendant in altering his plea is to get the conclusion of the argument, it ought to be refused; but his right to change it is limited only by the discretion of the Court.

2. Neither is it a ground of reversal that the Court permitted the counsel to speak in the wrong order.

3. A notice of special matter must state the facts on which the defendant relies, but in it need not be stated either the evidence by which they are to be established or the inferences to be made from them.

4. Persons who sold their stock in a Life Insurance Company and surrendered their policies on their own lives were competent witnesses in behalf of the Company, in a suit against it. The rule in Post *v.* Avery applies only to persons who have assigned choses in action, the recovery of which would have been for their own use, or where the claim assigned comes directly into controversy.

5. It lies on the party objecting to testimony to sustain his objection. In this case there was no evidence that the stock of the witnesses was not fully paid before the transfer.

6. It being provided in the conditions of insurance that any untrue or fraudulent allegation made in effecting the insurance will render the policy void, it was *Held*, that the representation by the insured that he was a farmer, whereas he was at the time a slave-taker by occupation, rendered the policy void.

7. In the life insurance policy in question every fact was material which increased the risk *or* which if disclosed would have been a fair reason for demanding a higher premium; and it is not material that the death was not produced by a cause connected with the subject of the misrepresentation.

8. The *occupation* of the applicant for insurance to be disclosed is that in which he is engaged *at the time of effecting the insurance.*

[Hartman v. Keystone Insurance Company.]

9. A late officer of a life insurance company who knows the practice of the office interested, and of other insurance offices, may be permitted to testify that the occupation of a farmer is considered the least hazardous; that an extra premium would usually be required of those who run cars on railroads; and that he considered *slave-catching* much more hazardous than farming, and that the company in question would not take a risk on any terms on the life of one known to be engaged in it; and such is the case though the printed tables of the company contain no reference to the occupations deemed *extra*-hazardous.

10. The declarations of the insured, made several months before his application for insurance, that he meant to effect an insurance upon his life, were not admissible to rebut evidence on the part of the insurance company that the insurance was effected with a view *to suicide*.

11. A condition of the policy being that it shall be void if the party "shall die by his own hand, in, or in consequence of a duel," it was *Held*, to include the case of suicide by swallowing arsenic. The first part of the clause is to be separated from the latter part of it, as the whole taken together would lead to an absurdity.

ERROR to the Common Pleas of *Dauphin county*.

This was an action of covenant to August Term, 1851, by Daniel Hartman, administrator of the estate of William Callender, deceased, *v*. The Keystone Mutual Life and Health Insurance Company of Harrisburg. It was founded on a policy of insurance granted to William Callender, upon his own life, in the sum of $5000, and was dated 26th March, 1851, for the period of one year, payable within sixty days after due notice and proof of the death of the insured.

The insurance was effected in Harrisburg, about noon of the 26th March, 1851. The insured left Harrisburg on the same day, and died at his own house in York, during the night following, at about half-past 3 o'clock A. M.

The execution of the policy was admitted in the pleadings, also the death and notice to the defendants. The company, in defence, plead that at the time of effecting the insurance Callender misrepresented his occupation, stating that he was *a farmer ;* whereas it was alleged that he was engaged in the business of *slave-catching*. And it was further alleged that he was also engaged in running cars on the railroad. It was also alleged in pleading, that the insured had committed *suicide*.

On January 21st, 1852, plea "covenants performed *absque hoc*."

In a notice of special matter notice was given on 2d March, 1852, that the defendant intended offering evidence to show that Callender came to his death by his own hand—that he committed suicide by taking arsenic: also his written and printed application for insurance, and that in the same he misrepresented his occupation—that he was not a farmer as stated therein, "but was engaged in running cars and travelling upon the railroad, and in the still more perilous business of slave-catching." Also that he purchased arsenic in Harrisburg on the day of insuring. Also

[Hartman *v.* Keystone Insurance Company.]

that evidence would be given of the declarations of Callender before and after he obtained the policy, indicating his intent to commit suicide, and that a *post mortem* examination was had, and "a large quantity of arsenic found in his stomach, causing his death."

On 19th January, 1853, a further notice was given that the defendants would offer in evidence the different rates of premium depending on the occupation of the insured, and that the company would not or did not at any time insure any person engaged in running cars upon the railroad or occupied in such business, at the rate of premium charged in this case.

On the 3d February, 1853, a rule was obtained to show cause why the defendant should not have permission to amend the pleading by withdrawing the words *absque hoc*, from the plea entered, and filing special pleas.

Special pleas were filed, and were, *first*, that Callender had committed suicide, which it was alleged they were *ready to verify*.

A further plea was filed as to the misrepresentation of his occupation, and it was alleged that his occupation was *slave-catching;* concluding as before.

A further plea was, that he was engaged in running cars on a railroad—with the same conclusion.

On the 15th March, 1853, after the case was called for trial, the application to amend the pleadings came before the Court, when the plaintiff objected to defendant withdrawing the plea of "*absque hoc*" as moved, because the object was to give the defendant *the conclusion to the jury;* also, to the special pleas, because the matter could be given in evidence under the general issue, and that the pleas were informal. These amendments the Court permitted, and plaintiff excepted. The plaintiff then *demurred* to the defendant's first special plea; which defendant then was permitted to amend by concluding his plea to the country instead of with a verification; and the plaintiff then replied specially to the defendant's second and third pleas.

In the replication to the *second* plea it was denied that the occupation was misrepresented; and it was alleged that the occupation of the insured was not that *of slave-catching*, and concluding to the country. In the replication to the *third* plea it was alleged that the occupation was not misrepresented, and that it was not that of slave-catching.

On the trial the policy was read on part of the plaintiff, and his counsel rested.

On part of the *defendant* evidence was given of the *post mortem* examination of the body of Callender and of his stomach, and of the detection of arsenic in it. Also of his purchase of arsenic in

[Hartman *v.* Keystone Insurance Company.]

Harrisburg, at about 8 o'clock A. M., of the day of his effecting the insurance.

It was also proved that Callender, about nine o'clock of that day, inquired of the witness as to the manner of obtaining an insurance; and that the witness advised the insurance: that in the course of their conversation Callender inquired the effect as to the policy if the person insured committed suicide. Also other evidence was given of his declarations made *before* the insurance, in order to show an intention on his part to commit suicide. He left Harrisburg on horseback, about one o'clock of the day of his insuring, for his home at York; he was ill on the way, and died during the night next following.

To support the issue under the second plea, evidence was given in order to show that Callender was concerned in hunting runaway slaves.

The application for insurance was given in evidence, in which it was stated that the applicant was *a farmer.*

Under the 3d plea evidence was given that Callender had been engaged in running a railroad market car; but it was testified that about four months before his death *he ceased doing so.*

It was proved, on part of plaintiff, that Callender, when young, was employed on a farm. That he was so engaged till he became a young man. That he never learned any other business than that of farming. That after he married he farmed for a year.

Another witness testified that he knew Callender to be farming in 1843 or 1844; and that the witness had made a bargain with him in the fall of 1850, to farm some land on the shares. That he had bought a horse and made arrangements to get another person to plough his corn ground *in the spring of* 1851. It was also testified that in the fall of 1850, Callender had also made arrangements for making brick.

In the list of particulars or conditions, on which information is required of applicants to this company for insurance, is an interrogatory, as follows:—

22. Is the party aware that any untrue or fraudulent allegation, made in effecting the proposed assurance, will render the policy void, and that all payments of premium made thereon, and dividend credits, will be forfeited?

In the declaration which Callender signed, when proposing the insurance, it was stated that "I do hereby agree that the said statement and this declaration shall form and be the basis of the contract between me and the said company, and that if the same be not in all respects true and correctly stated, the policy shall be void," &c.

In *the policy* it is declared to be its true meaning and intent, *inter alia,* that in case the assured shall, without the consent of

[Hartman *v.* Keystone Insurance Company.]

the Company previously obtained and endorsed upon the policy, be personally employed as an engineer or fireman, in running a locomotive or steamer, or in the manufacture or transportation of gunpowder, or in case he shall become so far intemperate as seriously to impair his health, or induce delirium tremens, *or shall die by his own hand, in, or in consequence of a duel,*" &c., " this policy shall be void, null, and of no effect."

In the course of the trial a person was offered as a witness on the part of the Company, who said, on his *voir dire*, that he was lately a stockholder in the company, and held a policy of insurance for $1500, at the time that Callender was insured; but that he ceased to be a stockholder a few days before, and surrendered his policy, and had ceased to be examining physician. That he sold his stock, threw up his appointment, and surrendered his policy, as he understood, to enable him to become a witness in this suit. He was objected to on the ground of *incompetency from interest*, but he was admitted.

Another person was offered, on the part of the company, who said that he was a stockholder in it at the time of Callender being insured,—that he then held a policy, and was then *clerk* to the company. That he sold his stock a year before, but surrendered his policy and resigned his clerkship at the request of the counsel of the company. That he knew at the time of the late Act of Assembly of 24th February, 1853, relative to the competency of witnesses, having been passed, and that it was necessary to make these arrangements in order to render him a witness.

The 2d section of the Act of 1853 (*Acts* page 108), provides that the provisions of the 13th section of an Act approved on 14th April, 1851, shall be so construed as not to apply to suits depending or that may hereafter be brought against the Keystone Insurance Company, for any claim for insurance, where the person whose life was insured, died before the passage of the aforesaid Act.

The 13th section of the Act of 1851 (*Acts*, page 559), provides that the provisions of a certain Act approved on 24th February, 1847, be extended to the said Keystone Insurance Company. And the provision in the 13th section of the Act of 1847, which, by the Act of 1853, it was in effect enacted was not to apply to this case (*Acts* of 1847, p. 161), was, *inter alia*, that "no member of the corporation shall be debarred his testimony as a witness in any case, on account of his being a member of the said company; and no member of the said corporation, not being in his individual capacity a party to such suit, shall be incompetent as a witness in any such suit on account of his being a member or an officer of said company."

It was proposed to prove by this witness, that the company would not have insured the life of a person employed in running

[Hartman *v.* Keystone Insurance Company.]

cars on a railroad or in catching slaves, or if they did, it would have been at a much higher premium; and that although they had no printed rules applicable to any but *safe lives*, their practice was to exact a much higher premium where the risk was great." This was objected to as irrelevant and incompetent; that it was not shown that the class of persons mentioned in the offer was embraced in the rules or table of premiums of the company; and that *notice* had not been given to the plaintiff, that the rates of premium would be increased by the fact that the applicant, *previous to his application for insurance*, had been engaged in running cars, or *in slave-catching, the notice* extending only to persons *then* so engaged, and that there was no condition in the policy that the *running* of cars upon a railroad *thereafter*, or the catching of slaves *thereafter*, should work a forfeiture of the policy :

Also that the testimony offered amounted to no more than *the opinion* of the witness.

The Court held it to be competent to prove misrepresentation at the time of effecting the policy, and that the business in which the party was engaged was more dangerous than the one he stated : That under the notices it was competent to prove the rates of premium charged or which would have been charged upon such occupations, and that the company did not insure and would not have insured the lives of persons *engaged in running cars on a railroad.*

The witness stated that the occupation of *a farmer* was the least dangerous—that no rates are published but for occupations deemed *safe*—that the business of running cars on railroads is deemed *hazardous*, and an extra premium charged :—that the rate of premium depends on the exposure to danger : he further said, "we would not take a person at any price if it was known that he was engaged *in slave-catching*. I consider it a much more perilous occcupation than farming—liable to be shot down or assassinated :— our rates of premium are based on good lives ; if extra danger as to occupation or residence or state of health exists, an extra premium is charged."

The Court rejected evidence offered on the part of *the plaintiff* that about two years before Callender's death, he declared his intention to quit the business of running cars, in which he was then engaged, and to have his life insured for the benefit of his wife and children ; and to follow it up by evidence of declarations, made by him on various occasions down to the time of his effecting the insurance, to the effect that he would have his life insured for the benefit of his family as soon as he got money enough, or could spare it from his business, to pay for the policy. This was offered in order to rebut any inference that he procured the policy, upon an idea recently conceived, witn a view to suicide.

[Hartman *v.* Keystone Insurance Company.]

The evidence was rejected on the alleged ground that it was not competent to show such intention by the declarations of the party; because it would be his mere statement unsupported by any *act* which it tended to explain.

After the evidence was closed, the plaintiff claimed the right under the pleadings in the cause to begin and conclude to the jury. The Court determined that the defendant under the pleadings had the right to begin and conclude for the following reasons: "The plaintiff had full notice more than thirty days before the trial that the pleadings would be so changed as to prevent the necessity of his preparing any evidence, and throw the *onus probandi* entirely on the defendant. This alteration has been allowed by the Court. In no event would the plaintiff have been called on to make more than mere formal proof had the pleadings stood as before; and the fair rule is, that the party who has to be first in proof, and maintain by evidence the affirmative of the issue, shall have the right to conclude to the jury." At plaintiff's request an exception was sealed to this decision.

PEARSON, J., charged the jury. In his answers to two of the points proposed on part of the plaintiff, he said: If the premium would have been increased, or the Company would have refused to insure altogether, had the true occupation been given, and a false one was stated, it would be such a falsehood as would vitiate the policy. That it need not be stated in the policy that it shall be void if any false representations are made. That the law requires the party to speak the truth. The conditions necessary to be inserted are those which are to avoid the policy, if it be violated after it is given. Further: If there was the suppression of a material fact increasing the risk, or which, if disclosed, would have led to the demand of a higher premium, or caused the insurance to be refused altogether, it is fatal to the policy: &c.

On March 19, 1853, verdict was rendered *for defendant.*

See the opinion of Chief Justice BLACK for the substance of the principal assignments of error.

The case was elaborately argued by *Fisher,* with whom was *Potts,* for the plaintiff in error.—It was, *inter alia,* contended that the misrepresentation, *to be material,* must be connected with the death of the insured, and that it was not shown that he lost his life when engaged in, or in consequence of having been engaged in, the capture of slaves; the instruction of the Court on this subject being, *inter alia,* "If you believe there was a statement of falsehood, or other suppression of the truth, in this particular, with intent to defraud, the policy is void, even if Callender did not lose his life when engaged in, or in consequence of having been

[Hartman v. Keystone Insurance Company.]

engaged in the capture of slaves. When such a contract is obtained by fraud, it is void from the beginning."

That the misrepresentation to avoid a policy must be material to the risk, reference was made, by the counsel, to the case of Clark v. Manufacturers' Insurance Company, 8 *Howard* 235–250.

*Berryhill* and *McCormick*, for the Company.—It was, *inter alia*, contended that a false assertion will vitiate a policy of insurance, even though the loss happen in a way not affected by that falsity: *Parke on Insurance*, 286. On true principles of equity and justice, the concealment or misrepresentation by the assured, whether wilful or not, of any such facts as might reasonably be supposed to have influenced the underwriter in taking the risk or fixing the rate of premium, will avoid the policy: *Arnould on Insurance*, vol. 1, 488. Policies on lives are equally vitiated by fraud or falsehood as those on marine insurance, because they are equally contracts of good faith, in which the underwriter, from necessity, must rely on the integrity of the insured for the statement of circumstances: *Park on Insurance*, 647–8, 327, 283; 3 *Kent* 282; 2 *Duer on Insurance*, 381; *Ellis on Insurance*, 111. If the assured conceals anything material for the company to know, the policy is void, and it matters not whether the assured considered it material or not; and what amounts to a misrepresentation or a material concealment is a question for the jury: 8 *B. & C.* 586; 3 *C. & P.* 350; 3 *M. & R.* 45. The materiality of facts concealed or misrepresented, is not to be determined by the event, but results solely from their probable influence on the estimated value of the risks at the time they were assumed. The question is not whether the loss that is claimed is attributable in any degree to the risks that were concealed; but whether, had the facts been known, the underwriter would have subscribed the policy, or would have limited himself to the premium that he received. He is discharged if the contract is not such as, with a knowledge of the truth, he would have consented to make: *Duer on Insurance*, vol. 2, 382.

The seventeenth and last error relates to the construction of the words of the policy. The intention is manifestly to guard against suicide, and there is but an error in punctuation. If the policy is to be considered silent on the subject of suicide, then on principle the same result must follow, for suicide would be a fraud on the insurance company, as clearly as the burning of a house by the party who had it insured would render a fire policy void.

The opinion of the Court was delivered, September 8, 1853, by
　BLACK, C. J.—This was covenant on a policy of insurance for the benefit of William Callender, the plaintiff's intestate, upon his

[Hartman *v.* Keystone Insurance Company.]

own life.   The defence set up by the company was that the assured had committed suicide, and that when he made application for the insurance he represented his occupation to be that of a farmer, though he was in fact not a farmer but a slave-catcher.   It was also pleaded that he had been engaged in running railroad cars, but the evidence did not show it.

There are seventeen specifications of error, but some of them are repetitions of others.   The material questions raised in the argument may be thus stated.

1. Whether it was erroneous to permit the defendants to amend their pleas as they were amended on the trial.

2. Whether the facts on which the defence based itself, could be given in evidence under the pleading and notices.

3. Whether persons who owned stock in the company and were insured by it, could give up their policies and sell out their shares for the express purpose of becoming witnesses, and thus make themselves competent to testify for the company.

4. Whether there was evidence of the assured being a slave-catcher, which the Court could submit to the jury.

5. Whether, if he was a slave-catcher, his declaration that he was a farmer was such a misrepresentation as made the policy void.

6. Whether the occupation of the assured was the trade or business which he had learned in his youth, or that which he was pursuing at the date of the policy.

7. Whether the testimony of the company's clerk, that he considered slave-catching a dangerous business, and that a risk would not be taken at any premium on the life of one known to be so engaged, is admissible; there being nothing in the printed rates of premium to show that persons of this class were considered hazardous lives.

8. Whether the declarations of the assured, several months before his application, that he intended to effect an insurance on his life, were admissible to rebut evidence given by the defendant tending to show that the insurance was effected with a view to suicide.

9. Whether the conditions of the policy must be so construed that the assured might commit suicide by taking poison, without thereby making the policy void.

We will consider these questions in their order, as I have set them down.

I. By the act of 1806, a defendant may amend or change his plea before or during the trial, if it be necessary that he should do so in order to reach the merits of the case.   His counsel is generally permitted to judge of this necessity.   The Court cannot tell whether it is needed or not, until they have all the evidence before

them. When an amendment is asked for with a view to some unfair advantage, such as throwing on the plaintiff the burden of proving a fact not previously put in issue, and thus exposing him to the danger of defeat or the necessity of a continuance; or where the object is to get the conclusion of the argument; it ought to be refused. And because every court is liable to be imposed on in this way, leave to amend ought never to be given unless the motion for it be supported by an affidavit that it will affect the merits of the case, and that the change is not desired for any other reason.

But we cannot reverse the judgment for an improper alteration of the plea. I do not find any case in which this has ever been done. A plaintiff may amend his declaration as he pleases, provided only that he does not introduce a new cause of action. If this rule be violated the judgment will be reversed, because we can determine it on a simple inspection of the record. But the right of the defendant to change his plea, is not limited by anything but the discretion of the Court, and by that he is held merely to good faith.

It is alleged here, and we think with some reason, that this amendment was made to give the defendant the right of addressing the jury in conclusion. If it was, and the Court discovered it in time, the purpose should have been defeated, and the conclusion given to the plaintiff notwithstanding. But neither is it a fatal error that the Court permitted the counsel to speak in the wrong order. It is true, the English cases say otherwise. There very much depends on having the last word, and more still on the right to begin. But an English trial bears so little resemblance to an American one, that their decisions on a point like this are entitled to no weight whatever with us.

II. It does not seem to us necessary to discuss the next question at much length. The pleas were sufficient to put in issue the facts proved. The variance alleged between the evidence and the notice is very unsubstantial. A notice of special matter must state the facts upon which the defendant relies, and not either the evidence by which they are to be established, or the inferences to be made from them. Here the plaintiff was in substance notified that proof would be given to show that Callender was insured as a farmer at a premium lower than would be taken from a person who was known to be engaged in running cars; that he was engaged in running cars, and also in the still *more* perilous business of slave-catching. From this we think the plaintiff was bound to understand that the company would either have declined the risk altogether or exacted a higher premium if they had known the assured to be engaged in the business they alleged him to have been following. Although, therefore, these notices are not very artistic nor much to be admired for their clearness, yet there is nothing in

[Hartman *v.* Keystone Insurance Company.]

them nor out of them which makes it necessary to reverse the judgment on that account. It is natural and right that we should lean, as we always do, against sustaining an exception which has so little to do with the merits.

III. The witnesses who sold their stock and gave up the policies they had obtained upon their own lives, were competent. The rule in Post *v.* Avery applies only to persons who have assigned choses in action on which the recovery would have been for their own use if no assignment had been made. The assignor cannot be a witness on the trial of an action in which the claim assigned comes directly in controversy. But otherwise he may. Thus a legatee having sold his legacy is a competent witness for the executor (4 *Barr* 373); or a widow, who has parted with her interest in the estate of her husband, may be admitted to testify in favor of his administrator: (7 *Barr* 315). A will may be proved by a legatee (1 *Ser. & R.* 275); or by a devisee (6 *Ser. & R.* 315) if he has released his interest before he is called.

It is said these witnesses were interested, because they were still liable to be called on for such instalments yet unpaid on their stock as should be necessary to meet the demands on the company, and the judgment in this case might increase the amount so called for. To say nothing of the remoteness of this interest, there is no proof which shows it to exist. It lies on the objecting party to sustain his objection. If the fact on which it rests be doubtful, the witness is heard. There was no evidence here which showed, or tended to show that the stock had not been fully paid up before the transfer. The plaintiff had the examination of the witnesses in his own hands before they were sworn in chief, and if he asked no question on this subject we presume it was because he knew the answer would be adverse to him.

They were not parties to the record in any sense which made it necessary to exclude their testimony for that reason.

All the arguments against the admissibility of these witnesses are disposed of at once by the decisions of this Court in Smith *v.* The Bank (5 *Ser. & R.* 318), and The Bank *v.* Green (3 *Watts* 374), where it was decided that persons who bore exactly the same relation to the parties were, nevertheless, entirely competent. Though these cases are older than Post *v.* Avery, I think I have shown that their authority is not shaken by it.

IV. It was shown on the trial, that the assured had not for many years been a farmer; that he had been at Wilkesbarre in search of fugitives, and had gone to Hagerstown to bargain for the apprehension of others; that he was at Harrisburg in pursuit of negroes whom he spoke of running over to Frederick without a warrant. In short, the evidence is very strong that for some months at least previous to his death, he was habitually and very diligently occu-

[Hartman v. Keystone Insurance Company.]

pied at this business. But what is more still to the purpose, he told a person at Hagerstown, a few days before he effected the insurance, that he was engaged in that business and had a man at Harrisburg who knew all the slaves that ran away from that part of Maryland. This is said to be frivolous, and so insufficient to establish the fact that the Court ought not to have permitted a verdict to be given on it. We are not of that mind.

V. If the insured, who represented himself to be a farmer, was in fact a slave-taker by occupation, and if the business of slave-taking would expose his life to greater danger than farming, it is not possible to escape the conclusion that the policy was thereby rendered void, since, if it was wilfully made, it was a fraud; and though made ignorantly, or by mistake, it was a warranty by the express terms of the policy. The plaintiff can only recover if the declaration of the assured, upon the faith of which the risk was taken, was strictly true in every material part. It will not do to say that this was immaterial. Every fact is material which increases the risk, or which, if disclosed, would have been a fair reason for demanding a higher premium. Nor is it of any consequence that the death was not, in fact, produced by a cause connected with the subject of the misrepresentation. One who falsely declares himself free from consumption cannot effect a valid insurance on his own life, though he die of cholera. A soldier or a sailor who warrants himself a merchant, has a void policy, even though he is not slain in battle or does not perish at sea. In such cases the whole contract is entirely void, as much as if it had never been made, and of course it cannot derive any force or validity from a subsequent event. Clark v. Manufacturers' Insurance Company (8 How. 235), cited by the plaintiff for the contrary doctrine, does not sustain it.

It is contended that the misrepresentation, to be fatal, must relate to some fact which would not only increase the risk, but also induce the insurer to demand a higher premium. The authority produced in support of this, is the Columbia Insurance Company v. Lawrence (2 Pet. 25; S. C. 10 Peters 557). The opinion in that case is expressly grounded on the construction of what are called the "fundamental rules" of the company there sued, and has no application to the question here. The law undoubtedly is, that a policy like the present one will be vitiated by the misrepresentation of any fact which would increase the risk merely; and so the general rule was laid down by C. J. MARSHALL, in the case cited. The policy before us provides, that it shall be void if the declaration be found in any respect untrue. This, of course, does not include inaccuracies which are not material. But anything which increases the risk cannot be immaterial.

The questions, whether there was any misrepresentation; whether,

[Hartman *v.* Keystone Insurance Company.]

if there was, it related to a fact which increased the risk; or would, if known, have influenced the company to demand a higher premium, or to decline the contract altogether, were all submitted to the jury on legal evidence, and with instructions which, in our opinion, are not open to any just exception.

VI. The Court very properly charged, that the occupation of the insured, which his duty required him to disclose, was that business which he was engaged in at the time he made his application. If it meant the trade he learned in his youth, and which he had followed years before, it would indeed be immaterial whether he told the truth or a falsehood, and it would have been mere folly in the insurers to ask him the question.

VII. The testimony of the clerk was rightly admitted. He swore, in substance, that a farmer's occupation was considered the least hazardous; that an extra premium would be charged for insuring one who was running on railroads; that no rates were included in the published tables except for occupations deemed safe; that *he* considered slave-catching much more hazardous than farming, and that they (the company) would not insure a person at any price who was known to be engaged in it.

It would have been wrong to exclude this on the ground that the printed tables (which are the same as those published by other offices) contained no reference to the occupations which are deemed extra hazardous. There was a good reason for omitting it. On persons pursuing some of these occupations no risk would be taken at all, and therefore no rates could be affixed to them. Upon others, the extra premium charged would depend so much on the particular circumstances, that a rule could not be given. But this omission to say in the printed tables that a slave-catcher would not be insured, is certainly no reason why one who follows that business might lawfully impose himself on the company as a farmer.

The mere opinion of a witness who knows no more about the subject than the jury, and who undertakes to draw from facts already proved deductions which they can make as well as he, is not admissible. An example of this is found in Jefferson Ins. Co. *v.* Cotheal (7 *Wend.* 72), where such evidence was rejected for the soundest reasons. How far the effect which a particular fact ought to have on the risk or the premium may be proved by witnesses conversant with the business, is a vexed question. But though the cases conflict seriously, I think none of them go so far as to say that one who knows the practice not only of the particular office, but of insurance offices generally, may not give his opinion of the influence which a given fact would have had as an element in the contract. Certainly this is the opinion supported by the strongest authority and the best reasons.

VIII. There is no rule of evidence which would have given the

[Hartman *v.* Keystone Insurance Company.]

Court the slightest excuse for admitting the declaration of the assured in favor of his own representative.

IX. The conditions of the policy are, that it shall be null and void "if the assured shall *die by his own hand, in or in conse- quence of a duel*, or by the hands of justice," &c.    The plaintiff argues that the first clause here quoted does not embrace a suicide committed by swallowing arsenic.    Where parties have put their contract in writing their rights are fixed by it.    But the contract is what they meant it to be, and when we can ascertain their mean- ing from the words they have used, we must give it effect.    One rule of interpretation is, that we must never attribute an absurd intent if a sensible one can be extracted from the writing.    No absurdity could be greater than a stipulation against suicide in a duel.    The words "die by his own hand" must, therefore, be disconnected from those which follow.    Standing alone, they mean any sort of suicide.

Besides this, the Court was very plainly right in charging that if no such condition had been inserted in the policy, a man who commits suicide is guilty of such a fraud upon the insurers of his life that his representatives cannot recover for that reason alone.

Judgment affirmed.

WOODWARD, J., dissented.

LOWRIE, J., was absent during the argument.