## Elwood, Appellant, *v.* New England Mutual Life Ins. Co.

506

Argued October 9, 1931.  Before FRAZER, C. J., WALL-ING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

*J. M. Graham,* with him *D. M. Evans* and *Patterson, Crawford, Arensberg & Dunn,* for appellant.——Under the incontestability clause, plaintiff can recover if he is disabled, even though he was sane at the time he attempted suicide: Northwestern Mut. Life Ins. Co. v. Johnson, 254 U. S. 96.

The question of plaintiff's sanity when he shot himself was for the jury: Connecticut Mut. Life Ins. Co. v. Groom, 86 Pa. 92; Am. Life Ins. Co. v. Isett, 74 Pa. 176; Ritter v. Ins. Co., 169 U. S. 139.

*R. G. Bostwick,* of *Thorp, Bostwick, Stewart & Reed,* for appellee.——The incontestability clause has no application: Ritter v. Ins. Co., 169 U. S. 139; Hopkins v. Ins. Co., 94 Fed. 729; Royal Arcanum v. Wishart, 192 Fed. 453; Thorne v. Ins. Co., 80 Pa. 15; Holt v. Green, 73 Pa. 198; Collins v. Ins. Co., 27 Pa. Superior Ct. 353; Burt v. Ins. Co., 187 U. S. 362; Northwestern Mut. L. Ins. Co. v. McCue, 223 U. S. 234.

There was no evidence that appellant was insane: Ortwein v. Com., 76 Pa. 414; Ritter v. Ins. Co., 169 U. S. 139.

The law is that, whether the insanity be general or partial, the degree of it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action: Taylor v. Com., 109 Pa. 262; Com. v. Cavalier, 284 Pa. 311; Com. v. Isett, 74 Pa. 176; Coyle v. Com., 100 Pa. 573.

OPINION BY MR. JUSTICE SCHAFFER, November 23, 1931:

In this action plaintiff seeks to recover from defendant insurance company under the disability clause contained in the policy of life insurance which it issued to him. His disability results from wounds self-inflicted

in an attempt to commit suicide. The court below denied recovery by entering judgment in defendant's favor notwithstanding a verdict for plaintiff and he appeals.

The clause upon which recovery is claimed reads thus: "If the insured, before attaining the age of sixty-five years, provided premiums have been duly paid and this policy is then in full force, becomes physically or mentally incapacitated to such an extent as to be wholly and permanently unable to engage in any occupation or profession or to perform any work for compensation, gain or profit; or suffers the irrecoverable loss of the entire sight of both eyes, or the severance of both hands at or above the wrists, or of both feet at or above the ankles, or of one entire hand and one entire foot; and after such disability has existed for ninety days, shall furnish due proof thereof to the company, at its home office, the company will waive the payment of any premium thereafter due upon the policy during the continuance of such disability. Upon acceptance of such proof, and during the continuance of such disability, the company will also pay to the insured an income of one hundred dollars a month."

Other clauses in the policy are to be considered in the solution of the question before us. One of them provides: "If the insured, whether sane or insane, shall die by his own hand or act, within one year from the date hereof, this policy shall be void and shall have no value; but in such event the company will return the premium paid." Another clause reads: "After one year from the date of issue, this policy shall be incontestable except for failure to pay premiums, and for violation of the conditions hereof relating to military or naval service in time of war." It was recited in the policy that part of the premium paid was for the inclusion of the disability provision.

The first claim of the plaintiff is that he is entitled to recover because he was insane when he shot himself. At the outset of the discussion, it should be borne in mind

that we are not dealing with a case where the beneficiary in an insurance policy is making a claim under it, but with one in which the insured himself is claiming to recover from the company a sum of money for himself, which becomes due, if at all, because of his wrongful act, provided he was sane when he committed it.

Plaintiff is a lawyer and at the time of the occurrence out of which this suit grows he was 55 years of age. He had been a member of the Allegheny County Bar for 27 years, engaged in the active practice of his profession. Prior to September 30, 1927, the date on which he attempted suicide, he had, so he testified, never thought of self destruction and had enjoyed normal health. He had for sometime been depressed and worried over his financial affairs, largely because of the fact that he had not been as successful in his profession as he deemed he should have been. He was happily married and was the father of three children, owned his own home, which was unencumbered, and had a half interest in the estate of his father, which apparently had a clear value approximating $150,000. His worries had been largely financial. The particular thing which gave him concern was that he had borrowed $24,000 from the bank in which he was a director, interest on which was about due, he owed office rent and expenses amounting to between $2,000 and $3,000 and feared that he might have to close his law office. He had remodeled his home at a cost of twice as much as he had anticipated. He was perturbed because the income from his inheritance was not up to his expectations. The tuition charge for his two daughters was due. Preceding his attempted suicide, he had been for sometime depressed and tired, and he walked with his head down and did not always speak to his friends. In the preceding spring he had taken a revolver to his office to get it out of the way of his young son and had placed it in a box in a pigeon hole in his desk. He had never thought of suicide until the morning he attempted it. Arriving at his office, he suddenly felt that

he could not endure life any longer, took the revolver out of his desk, wrote a note to his family asking them to forgive his act of cowardice, went out of his office, mailed it, returned to the office, shot himself in the back of the head, found himself, to his astonishment, alive, lay down on the floor, arose, shot himself in the abdomen, and lay down again. Finding that this second wound did not kill him, he reasoned that he would cripple himself so as to become a charge on his family if he inflicted further injury; so getting up, he called his wife on the telephone, told her what he had done and asked her to be a better soldier than he was, told her, in answer to her inquiry, where he was, and again lay down on the floor, and waited for someone to come to him. In response to the wife's telephone message to a friend, the latter came to his office and had him removed to a hospital. Plaintiff testified lucidly and in full detail as to all the incidents in connection with the shooting, his feelings, his thoughts and his actions. On cross-examination, asked whether he knew that his act was wrong, he answered that he did. He gave as his excuse for it, "I felt that I had not been a success, the success that I felt I should have been. My father was an able man, a brainy man, and my mother was a bright woman and able, and I felt that I had never been able to do what I felt I should be able to do. I felt, really, a failure."

Fragments of the bullet remain in his skull and the effect of his injuries apparently is to incapacitate him to such an extent as to make it impossible for him to practice law or possibly to engage in any occupation for gain or profit.

A physician, specializing in nervous and mental diseases, called by him, testified that plaintiff at the time he shot himself was mentally sick, with a condition which he termed a mental depression, based upon the presence of certain difficulties in his life which he saw out of their real proportion. The witness said these difficulties led him to attempted suicide. The witness did

not say he was insane, but that in his opinion plaintiff was not able to discern at the time he shot himself that self-destruction was wrong or to comprehend the moral nature and effect of his act. The only contact this witness had with plaintiff was almost four years after the shooting. Against this testimony, we have that of plaintiff himself, that he was fully conscious of his act, knew that it was wrong, and that he reasoned before, during and after the shooting in a way indicating that he was in possession of his faculties. There was no indication of any break in the continuity of his thought, or any lapse of memory.

We agree with the court below that unless insanity is to be presumed from the mere fact of attempted self-destruction, there is no basis in this case for the conclusion that the plaintiff was insane. No one testified to anything before the shooting which in the slightest degree indicated insanity, and no one pretends that immediately after the shooting he was insane, or that up to the time of trial he evidenced any mental aberration. On the contrary, all his mental processes were those of an entirely sane man. His wife and his office associate, the persons who saw the most of him, testified to the normalcy of his acts, conversation and behavior. An alienist called by the defendant, who examined plaintiff, testified that in his judgment he was sane. As was said by the learned president judge of the court below, who tried the case: "The plaintiff knew the consequences of his act, he knew and stated in writing [in the letter which he wrote just before shooting himself] that it was a cowardly act. He appreciated the distress which his act would bring upon his wife and family and begged their forgiveness." It would be impossible in the light of his own testimony to find that he was insane. As was further observed by the trial judge: "The desire to end unhappiness and escape trouble, or the loss of stamina and courage, leading to the act of suicide, do not amount to insanity." Here there is no occasion to rely upon in-

ferences as to the state of mind of the insured, as in the case where suicide has taken place. We have a calm, truthful and complete account from his own lips of his reasons, thoughts, actions and reactions during the brief period in which he attempted to take his own life. They all speak for his sanity. If he had shot someone else and was on trial for the crime, it could not be pretended that he was not mentally responsible. The court below properly determined, in disposing of the motion for judgment non obstante veredicto, that there was not sufficient evidence of insanity to warrant the submission of that question to a jury.

Plaintiff also contends that he can recover even though he was sane at the time he attempted suicide, because of the provision in the policy making it incontestable after one year. In substance, he urges that the company recognizes liability under the terms of the policy, in the event of suicide, even if sane, after one year, since in addition to the incontestability-after-one-year feature, there is the specific recital in it, "If the insured, whether sane or insane, shall die by his own hand or act within one year from the date hereof, this policy shall be void and shall have no value." His contention is that this, taken in connection with the incontestability clause, means whatever the state of mind of the insured was at the time of the attempted suicide, whether he was sane or insane, if it came to pass after one year from the date of the policy, the company must pay: Morris v. State Mutual Life Assur. Co., 183 Pa. 563; Marcus v. Heralds of Liberty, 241 Pa. 429. Had suicide been actually consummated, this may be admitted and yet not reach the question posed on this record. We are not dealing with suicide accomplished, but with an attempt at self-murder; not with the rights of a beneficiary who is himself guilty of no wrongdoing but with those claimed by the insured who himself has been guilty of one of the great moral wrongs, of a crime infamous at common law, if completed, a species of felony (8 R. C. L. 351). In some

jurisdictions an attempt to commit suicide is a felony (Ibid. 352). Had the plaintiff instead of attempting to kill himself, intentionally blinded or maimed himself in one of the particulars mentioned in the policy for the purpose of seeking recovery from the company and then asserted a claim against it for $100 a month for the rest of his life, it would shock one's sense of justice to permit him to acquire the money. In principle there is little, if any, difference between that situation and the one before us; in each event, the defendant would be paying the insured for his own wrongdoing.

We are of opinion that the suicide cases, those in which self-destruction was accomplished, should not control such a case as this, that the guiding principle is different. A principle of public policy, operating on the wrongdoer himself, is and should be invocable here, which cannot be applied against a surviving beneficiary who is guiltless of any act contrary to good morals. The vital question before us was not considered in Northwestern Mutual Life Ins. Co. v. Johnson, 254 U. S. 96, cited by plaintiff, in which the Supreme Court of the United States was called upon to determine the effect of an incontestable clause in a life insurance contract where self-destruction had occurred. The court, in saying (at page 101) that the clause was "laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact, except the fact of death, and as soon as it reasonably can be done," was speaking of its laudableness not as applied to the insured himself. It was said in that case that the public policy with regard to such contracts is a matter for the states to decide.

In Ritter v. Mutual Life Ins. Co., 169 U. S. 139, 154, the salutary legal principle is laid down that "A contract, the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the founda-

tion of its judgment. If, therefore, a policy,—taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators or assigns,—expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him, or to whom he was indebted." With stronger reason can this principle be applied to a case such as that before us, in which the insured by his own act is not making provision for others but for himself.

In Collins v. Metropolitan Life Ins. Co., 27 Pa. Superior Ct. 353, where the assured was legally executed for crime and recovery was sought on a policy on his life, it was said that even had the policy expressly insured against this risk, such a contract could not be sustained on grounds of public policy. We approve the reasoning in that case (page 356) : "We cannot give this clause [providing for incontestability] that effect. By its terms, it is not the claim presented by the assured, irrespective of the cause of death, which is made incontestable; it is merely the validity of the policy, as an obligation binding upon the company. The two years having expired the company could not escape liability by showing that the insured, at the time the contract was made, had mistakenly, not fraudulently, made misstatements as to his family history or age. The effect of the stipulation in question was not to change the covenants of the contract at the expiration of two years. Those covenants are still the contracts of the parties, and the liability of this defendant is that which under the law to such covenants attaches. ...... Public policy forbids the insertion in the contract of a condition which would tend to induce crime, and as it forbids the introduction of such a stipulation it also forbids the enforce-

ment of a contract under circumstances which cannot be lawfully stipulated for." As long ago as Hartman v. Keystone Ins. Co., 21 Pa. 466, we declared the public policy of the State in such cases as this by ruling (page 479) that "a man who commits suicide is guilty of such a fraud upon the insurers of his life that his representatives cannot recover for that reason alone." The public policy prohibition against recovery has been applied in cases where the beneficiary had murdered the insured (Robinson v. Metropolitan Life Ins. Co., 69 Pa. Superior Ct. 274), where there had been an illegal operation causing the death of insured (Wells v. New England Mutual Life Ins. Co., 191 Pa. 207), and of course in fire insurance where the insured has fired his own building (Showalter v. Mutual Fire Ins. Co., 3 Pa. Superior Ct. 448). There is nothing in Northwestern Life Ins. Co. v. Johnson, 254 U. S. 96, which would warrant the conclusion that the public policy rule should not apply to such a case as this. Furthermore, it is said in that case, as before noted, that the decision as to a contravention of public policy is for the determination of State tribunals.

Had the plaintiff been insane at the time he shot himself, then he might recover (Connecticut Mutual Life Ins. Co. v. Groom, 86 Pa. 92), because he was in a condition not morally responsible, but here, by his own admissions and under his own testimony, he is shown not to have been insane. All the testimony in the case on both sides upon which dependence can be placed speaks for his sanity. The incontestable clause has no application under the fact here established that the plaintiff at the time he attempted his own life was sane.

Recovery must be denied.

The judgment is affirmed.