## Boyd v. Operating Engineers Welfare Fund of Eastern Pa. and Del.

*Herbert Brener*, for plaintiff.

*Thomas N. O'Neill, Jr.*, for defendants.

BELOFF, J., July 29, 1959.—This is an action in assumpsit commenced by Lena Boyd, widow of Hugh

Boyd, against defendants seeking to recover $2,500, a double indemnity benefit under a union welfare fund policy. The deceased committed suicide.

Hugh Boyd was an employe of the Operating Engineers and as such employe was a member of the Operating Engineers Welfare Fund of Eastern Pennsylvania and Delaware, Local 542. The said welfare fund was established for the benefit of the employes, and the contributions to the fund were made only by the employers. The fund was supervised by a board of trustees, comprised of representatives of the employers and of the union.

This welfare fund was inaugurated on or about May 1952. Before very long a dispute developed within the ranks of the union officers and membership as well as between the union and management, with the result that the welfare fund moneys were deposited in several accounts known as "The Broad Street Account" and the "Fidelity Account". These two accounts were subsequently merged on or about January 1953, in "The Girard Trust Account."

Hugh Boyd died on December 5, 1952. His death was due to suicide and his widow, plaintiff in this proceeding, was paid $2,500 from the welfare fund. She now makes claim for an additional $2,500 on the theory that her husband's death was "accidental." She contends that under the resolution and precedent set by the welfare fund trustees, suicidal death was considered accidental with respect to payment of double indemnity benefits.

Defendants resist this claim on the theory that suicide is not accidental death. They maintain that in May of 1953, when the trustees of the welfare fund considered the claim of plaintiff, they adopted a resolution instructing their counsel to contest this claim, that, moreover, under the terms of the agreement setting up the welfare fund, the trustees are given wide

discretion with regard to claims for benefits, and their decision was not to honor the claim of plaintiff for accidental death benefits.

The history of the so-called welfare fund from the time of its inception until the death of Mr. Boyd was brief but stormy and resulted in part in the creation of the several depositaries, already referred to, for the welfare fund.

Plaintiff predicates her claim essentially upon the fact that a custom or precedent had been established for the payment of double indemnity benefits in cases of suicide, and that death by suicide was to be considered by them as "accidental." Plaintiff cites the case of another employe, one Howard Mills, a member of the same welfare fund who died on January 21, 1952, a suicide, by shooting himself, whose estate was paid $5,000 on the theory that his suicide was considered in the category of accident. This, it is argued, set the precedent in suicide cases. In addition, the trustees of the welfare fund, at one of their regular meetings, in September of 1952, adopted a resolution, duly entered in their minutes, to treat suicidal deaths as accidental deaths, thereby entitling the estate or beneficiary of decedent insured to double indemnity benefits. The minutes of the meeting when this resolution or motion was adopted were not presented in court.

It appears in the evidence through the testimony of one Paul Ryan, who admittedly was the secretary of the welfare fund and present at all of its trustees' meetings, that he took the minutes in long hand, and subsequently had them transcribed and filed in the office of the walfare fund. His pertinent testimony touching upon this matter on page 28 of the notes of testimony was as follows:

"Q. Will you tell us what transpired at the meeting in December of 1952? (While this date appears in

the notes of testimony as *December 1952* on this page, there is no doubt that what the witness meant was *September of 1952* as appears with abundant clarity in numerous instances in the evidence and as conceded by defendants in their brief.)

"A. There was a discussion of suicidal death and that evolved from the Mills' claim and that was settled on the basis of double indemnity and the trustees agreed in the future to treat other suicide deaths as double indemnity claims."

Obviously the members of a union or other organization are bound by its laws and regulations and subject to its discipline. See 63 C. J. §46, p. 681; St. Mary's Beneficial Society v. Burford's Administrator, 70 Pa. 321; 10 C. J. S. §34, p. 279. We must observe, however, that this rule works both ways. The rules must be adhered to by the officers representing the association, even as the members must abide by them.

One of the important factual questions then, for us to resolve, is whether or not a resolution was in fact adopted at a meeting in September 1952, to treat all suicides as claims warranting double indemnity benefits.

In this regard we have already quoted the essential testimony of Paul Ryan, the secretary. His testimony was positive and unequivocal. There is nothing to indicate that he was in any way biased or had a personal interest in the subject matter.

The defense countered by calling several witnesses who were members of the board of trustees and who testified that they had no recollection of any such resolution. As has already been stated, the written minutes of that meeting were not available at the time of trial.

We are inclined to accept the testimony of Ryan as worthy of belief and credible, and we find as a fact

that such a meeting did take place in September of 1952, and that the resolution as to which he testified was in fact adopted.

There is also the factor that plaintiff, when making her claim, asserted that her husband was deranged at the time he committed suicide.

In that regard it is appropriate to quote the words of the late President Judge Keller in Longenberger v. Prudential Insurance Company of America, 121 Pa. Superior Ct. 225, at page 235: "There are many people who believe that no one in the full possession of all his faculties ever commits suicide; and, in any event, it is a matter difficult to prove or establish."

As to the question of burden on plaintiff to prove insured was not of sound mind when he committed suicide, see Supreme Council of Royal Arcanum v. Wishart, 192 Fed. 453, and numerous cases therein cited on this point, including Ritter v. Mutual Life Ins. Co., 169 U. S. 139, 18 S. Ct. 300; Insurance Co. v. Rodel, 95 U. S. 232.

In modern times distinctions have been made between types of suicide, when evidence of mental derangement was satisfactorily presented. See "The Judicial Interpretation of Suicide", 105 U. of Penna. L. Rev., pp. 391 ff. See also Widdis v. Collingdale Millwork Company, 169 Pa. Superior Ct. 612, 614 (1951); 1 Appleman, Insurance Law and Practice, §363; 2 Golden, The Law of Insurance in Pennsylvania, §937, p. 835. Perhaps it should be noted parenthetically that while these and the other cases cited herein do not particularly touch upon the question of double indemnity benefits they do, however, discuss the problem of suicide and the judicial determination of self-inflicted death in terms of insurance benefits generally. For this reason, they are here included.

In certain conditions self-inflicted death was not considered "suicide" and benefits flowing from vari-

ous forms of insurance coverage have been to some extent liberalized and benefits allowed. However, we think that the fundamental philosophy of the law does not consider suicide as accident, and, indeed, historically, attempted suicide has been held to be a crime. Payment predicated on suicide was frequently considered contrary to public policy, and its disallowance was by way of condemnation of the taking of one's own life. There is respectable authority in support of this view. See Longenberger v. Prudential Insurance Company of America, supra; Elwood v. New England Mutual Life Ins. Co., 305 Pa. 505, 513; Northwestern Mutual Life Insurance Company v. Johnson, 254 U. S. 96.

However, where, as here, the governing body of a welfare fund, to wit, the board of trustees, has, by resolution and by precedent in the Mills case, adopted the philosophy and view that they considered and would consider suicide as coming within the scope of accident, thereby entitling the estate or the heir to double indemnity benefits, we will not disturb such interpretation and action by a duly constituted governing body or board of trustees. In Crow v. Capital City Council, 26 Pa. Superior Ct. 411, 423, it was said: "In interpreting the rules and regulations prescribed by their laws [unions], the civil courts are always inclined to sustain them. . . ." See also Engle v. Pottsville Division No. 90, 66 Pa. Superior Ct. 356, 362; Sperry Appeal, 116 Pa. 391. See also Steel v. Driver Salesmen's Union, Local No. 463, 147 Pa. Superior Ct. 172, 177, citing Grand Legion Select Knights v. Beaty, 224 Ill. 346, 79 N. E. 565; Briggs v. Royal Highlanders, 84 Neb. 834, 122 N. W. 69; Jackson v. Loyal Additional Beneficial Assoc., 140 Tenn. 49, 205 S. W. 318; 6 Couch, Cyclopedia of Insurance Law, §1262a, p. 4614.

At least one of defendant's witnesses, who was a member of the board of trustees, testified that each case is considered on its own merits, but no distinguishing reason was given wherein the merits in plaintiff's case differed from the precedent established in the Mills case.

There can be no question about the propriety of resting discretion in the hands of the board of trustees. But the trustees may not abuse that discretion nor deny an appeal to judicial review. Nor may they adopt a resolution of policy, and then capriciously carry it out as to one member and violate it as to another. That is not a use of discretion; that is a matter of violating their own regulations and their own resolutions.

Were the Mills claim paid, and no resolution such as that testified to by Mr. Ryan adopted, we would deny plaintiff's claim in the matter before us if it were shown that a mistake or violation of a rule had been committed in that case. We would then not lend ourselves to a perpetuation of such an error. But, as already stated, the trustees, believing as we do the testimony of Mr. Ryan, bound themselves and the organization by specific resolution to treat suicide as accident and subject to double indemnity benefits. In the light of this history we cannot consider the Mills suicide, interpreted as an accident, to be a mistake, or indeed a violation of the duties of the board of trustees. Rather, we must view this precedent as the carrying out of the intention of the board of trustees, which intention was formalized in the resolution of September of 1952. See Shipley v. Pittsburgh & L. E. R. Co., 83 F. Supp. 722.

We still are of the opinion that the law generally views with disfavor the giving of recognition to suicide as an accident or the allowing of a claim by a suicide's beneficiary for double indemnity benefits. It would

be a simple matter for the board of trustees to adopt a resolution and make it part of their guiding and basic principle that suicide may not be the basis for payment of double indemnity benefits. See Hey v. Guarantors' Liability Indemnity Co. of Pennsylvania, 181 Pa. 220; Trietschler v. The Keystone Mutual Beneficial Association, 180 Pa. 205; Longenberger v. Prudential Insurance Company of America, supra.

However, it must be borne in mind that such a resolution cannot operate ex post facto, and therefore the adoption of the resolution of May 1953, by the board of trustees to contest the claim of plaintiff herein, and to disregard the claims of beneficiaries of suicides for double indemnity benefits cannot operate retroactively so as to deny this plaintiff her rights. See Northwestern Mutual Life Insurance Company v. Johnson, supra; Steel v. Driver Salesmen's Union, supra.

For the reasons set forth the court finds for the plaintiff in the sum of $2,500.