# RITTER v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 142. Argued December 3, 6, 1897.—Decided January 17, 1898.

This was an action on six policies of insurance, all alike (except as to the amount of insurance), and in the following form: "In consideration of the application for this policy, which is hereby made a part of this contract, the Mutual Life Insurance Company of New York promises to pay at its home office in the city of New York, unto William M. Runk, of Philadelphia, in the county of Philadelphia, State of Pennsylvania, his executors, administrators or assigns, twenty thousand dollars, upon acceptance of satisfactory proofs at its home office of the death of the said William M. Runk during the continuance of this policy, upon the following condition, and subject to the provisions, requirements and benefits stated on the back of this policy, which are hereby referred to and made part hereof. The annual premium of seven hundred and eighty-two dollars shall be paid in advance on the delivery of this policy, and thereafter to the company, at its home office in the city of New York, on the tenth day of November in every year during the continuance of this contract. In witness whereof," etc. The principal defence was that the assured, when in sound mind, deliberately and intentionally took his own life, whereby the event insured against — his death — was precipitated. One of the issues was the sanity or insanity of the assured when he committed self-destruction. *Held,*

(1) If the assured understood what he was doing, and the consequences of his act or acts, to himself as well as to others — in other words, if he understood, as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family and others, and was able to comprehend the wrongfulness of what he was about to do, as a sane man would, then he is to be regarded as sane;

(2) In the case of fire insurance it is well settled that although a policy, in the usual form, indemnifying against loss by fire, may cover a loss attributable merely to the negligence or carelessness of the insured, unaffected by fraud or design, it will not cover a destruction of the property by the wilful act of the assured himself in setting fire to it, not for the purpose of avoiding a peril of a worse kind but with the intention of simply effecting its destruction;

(3) Much more should it be held that it is not contemplated by a policy taken out by the person whose life is insured and stipulating for

the payment of a named sum to himself, his executors, administrators or assigns, that the company should be liable, if his death was intentionally caused by himself when in sound mind. When the policy is silent as to suicide, it is to be taken that the subject of the insurance, that is, the life of the assured, shall not be intentionally and directly, with whatever motive, destroyed by him when in sound mind. To hold otherwise is to say that the occurrence of the event upon the happening of which the company undertook to pay; was intended to be left to his option. That view is against the very essence of the contract;

(4) A contract, the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the foundation of its judgment;

(5) If, therefore, a policy — taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators or assigns — expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him, or to whom he was indebted. The case is not different in principle, if the policy be silent as to suicide, and the event insured, the death of the assured, is brought about by his wilful, deliberate act when in sound mind.

THE case is stated in the opinion.

*Mr. Richard C. Dale* and *Mr. George Tucker Bispham* for plaintiff in error. *Mr. John Hampton Barnes* was on their brief.

*Mr. John G. Johnson* for defendant in error. *Mr. Charles P. Sherman* and *Mr. Edward Lyman Short* were on his brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought against the Mutual Life Insurance Company of New York on six policies of life insurance, each bearing date November 10, 1891, one for $20,000, one for $15,000, and four for $10,000 each. There was a verdict in its favor, upon which judgment was entered, and that judgment was affirmed in the Circuit Court of Appeals. 28 U. S. App. 612.

The policies were all alike except as to the amount of insurance, and were in the following form:

"In consideration of the application for this policy, which is hereby made a part of this contract, the Mutual Life Insurance Company of New York promises to pay at its home office in the city of New York, unto William M. Runk, of Philadelphia, in the county of Philadelphia, State of Pennsylvania, his executors, administrators or assigns, twenty thousand dollars, upon acceptance of satisfactory proofs at its home office of the death of the said William M. Runk during the continuance of this policy, upon the following condition, and subject to the provisions, requirements and benefits stated on the back of this policy, which are hereby referred to and made part hereof. The annual premium of seven hundred and eighty-two dollars shall be paid in advance on the delivery of this policy, and thereafter to the company, at its home office in the city of New York, on the tenth day of November in every year during the continuance of this contract. In witness whereof," etc. The "provisions, requirements and benefits" thus made part of the policy will be referred to hereafter.

The assured died October 5, 1892, all premiums falling due previous to his death having been paid. It is not disputed that he took his own life.

In the affidavit of defence filed by the insurance company, it is stated that at or about the time of the execution of the policies in suit, Runk held policies upon his life to the extent of $315,000 issued to him by other companies; that during the year 1892 he effected additional insurance to a considerable amount, the total amount at or about the time of his death being $500,000; that prior to taking the additional insurance of $200,000, he was indebted in a very large amount by reason of the improper use of moneys entrusted to him in a fiduciary and in a quasi-fiduciary capacity; that he was without resources of his own sufficient to meet the amount of that indebtedness; that he was confronted with the fear of being convicted of breach of trust, and was desirous to protect pecuniarily those whom he had injured; that he deliberately determined to commit suicide for the purpose of escaping the

necessity of meeting those whose confidence had been betrayed, and with the intention, through moneys expected to be paid on his policies of insurance, to liquidate wholly or in part the debts owing by him; that he deliberately and intentionally took his life, being at the time in sound mind and in the full possession of his mental faculties; and that his suicide was not the result of nor occasioned by mental unsoundness, but was the act of a man mentally and morally able to understand all the consequences thereof.

The affidavit of defence also contained the following statements:

"The policies of insurance sued upon contain a reference to the application therefor, which is made a part of the contract of insurance. A copy of this application is hereto attached, which, it is prayed, may be taken as a part of this affidavit. Under the advice of counsel the defendant avers that this application is a part of said contract, and that the contract of insurance was a contract made in the State of New York, and to be interpreted by, and in accordance with, the laws of that State.

"The policies of insurance sued upon were delivered to the said Runk upon the faith of an independent contract entered into by him, embodied in the said application, to the effect that if such policies should be granted, he, the said Runk, did, 'warrant and agree . . . that I will not die by my own act, whether sane or insane, during the said period of two years' — said period of two years dating from the 6th day of November, 1891.

"The said Runk did, within the period of two years, commit a breach of said contract by killing himself, as has been before stated, in the way and manner above recited. By reason of the breach of said contract, and only by reason of such breach, the policy of insurance matured, and damages occasioned by such breach are equivalent in amount to that demanded under the policies."

Each of the applications for policies signed by the assured and attached to the affidavit of defence contained the following:

"I hereby warrant and agree . . . not to engage in any specially hazardous occupation or employment during the next two years following the date of issue of the policy for which application is hereby made, and also not to engage in any military or naval service, in time of war, during the continuance of the policy, without first obtaining permission from this company; I also warrant and agree that I will not die by my own act, whether sane or insane, during the said period of two years."

At the trial below the defendant offered in evidence Runk's application for insurance. This was objected to on the ground that the application was not attached to the policy, and under an act of the General Assembly of Pennsylvania approved May 11, 1881, could not, for that reason, be considered as part of the contract, or be admitted in evidence. The defendant, by counsel, stated at the time that the paper was not offered for the purpose of making it as an "application" part of the contract, but to prove that an independent, collateral, contemporaneous agreement was entered into by which Runk stipulated that he would not die by his own act, whether sane or insane, during the period of two years. The objection to this evidence was sustained, Judge Butler, who presided at the trial in the Circuit Court, observing: "The representation or statement or agreement, call it by whatever name you choose, is in my estimation a part of the application for insurance, and it constitutes a condition on which the policy was applied for and obtained, as much so as any representation contained in the paper itself, and it is therefore by the statute excluded by reason of the fact that a copy was not attached to the policy. . . . The statute intended that the policy shall exhibit on its face, or the policy in connection with whatever it refers to shall exhibit to the insured the conditions on which he holds the policy. The object of this would be to limit the policy of insurance, to qualify it, to make it available only in case the party lived up to this contract."

The statute of Pennsylvania to which reference was made is in these words: "That all life and fire insurance policies upon the lives or property of persons within this Common-

wealth, whether issued by companies organized under the laws of this State, or by foreign companies doing business therein, which contain any reference to the application of the insured or the constitution, by-laws or other rules of the company, either as forming part of the policy or contract between the parties thereto, or having any bearing on said contract, shall contain, or have attached to said policies, correct copies of the application, as signed by the applicant and the by-laws referred to; and, unless so attached and accompanying the policy, no such application, constitution or by-laws shall be received in evidence, in any controversy between the parties to, or interested in, the said policy, nor shall such application or by-laws be considered a part of the policy or contract between such parties." Laws of Pennsylvania, 1881, No. 23, p. 20.

Whether the Circuit Court erred in excluding the application which, by the terms of the contract, constituted the consideration of the company's promise to pay, is a question that need not be considered. If error was committed in this particular, it was one for the benefit of the plaintiff in the action; for, if the application had been admitted in evidence as part of the contract of insurance, the agreement and warranty of the assured not to die by his own act, whether sane or insane, within two years from the date of the policy, would have precluded any judgment against the insurance company. *Travellers' Ins. Co.* v. *McConkey*, 127 U. S. 661, 666. Upon this writ of error therefore we must assume that the contract of insurance contained no such agreement or warranty by the assured, nor any express condition avoiding the policy in case of suicide. Besides, the defendant does not insist that this court should determine the rights of the parties upon the basis that the application of Runk constituted part of the contract of insurance. It may be added that we do not wish to be understood as expressing any opinion upon the question whether the Circuit Court erred either in its construction of the Pennsylvania statute of 1881, or in applying that statute to the policies here in suit.

At the trial in the Circuit Court, the plaintiff submitted the following points:

1. The evidence was not sufficient to warrant the jury in finding that the deceased entered into the contracts of insurance evidenced by the policies sued upon with the intention of defrauding the company.

2. The evidence was not sufficient to warrant the jury in finding that the deceased entered into the contracts of insurance with the intention of committing suicide.

3. The evidence upon the part of the defendant did not warrant any inference of fact constituting a defence in law to the plaintiff's right to recover the amount due upon the policies.

4. The mere fact that the insured committed suicide did not, standing alone, avoid the policies, there being no condition in them to that effect.

5. If one whose life is insured intentionally kills himself when his reasoning faculties are so far impaired by insanity that he is unable to understand the moral character of his act, even if he does understand its physical nature, consequence and effect, such self-destruction will not of itself prevent recovery upon the policies.

The company submitted the following points as the basis of instructions to the jury :.

1. There could be no recovery by the estate of a dead man of the amount of policies of insurance upon his life, if he takes his own life designedly, whilst of sound mind.

2. If the jury found that Runk committed suicide when he was of sound mind, being morally and mentally conscious of the act he was about to commit, of its consequences, and of its nature, with the deliberate intent to secure to his estate and to his creditors, the amount of the policies sued upon, there could be no recovery.

3. If the jury found that Runk obtained the policies of insurance sued upon at a time when he was insolvent and an embezzler, with the intent thereby to secure, in case of his death, from the defendant, a fund with which to pay those to whom he was indebted, and whose property he had embezzled, and subsequently committed suicide, whilst of sound mind, with the deliberate intent to carry out this scheme, there could be no recovery.

4. The defendant was entitled to set off the loss occasioned by the failure of Runk to keep his agreement not to die by his own hand within two years of the date thereof; and the amount of this loss cannot be less than that of the policies sued upon.

The court disaffirmed the plaintiff's first, second and third points without comment. It disaffirmed the plaintiff's fourth point relating to the effect upon the rights of the assured of suicide standing alone, and affirmed the defendant's first point relating to the same matter.

The plaintiff's fifth point was affirmed, the court, however, accompanying its affirmance of that point with some observations to be presently referred to.

It will be observed that the plaintiff's first and second points assumed that the evidence was not sufficient to warrant a finding that the assured entered into the contracts of insurance with the intention either to defraud the company or to commit suicide. The court rightly refused to so instruct the jury. When the last policies were taken out by Runk he was carrying insurance on his life for an amount large enough to require annual premiums of about $12,000. His income, so far as the record shows, was inadequate to meet such a burden. And yet, in 1891, he largely increased the insurance on his life, and added about $8000 to the sum to be paid annually for premiums. Besides these facts, it appeared that on the day before his death he avowed that his debts must be paid, and that they could only be paid with his life. That avowal was in a letter written to his partner, in which he said that he had deceived the latter, and could only pay his debts *with his life*. That letter concluded: "This is a sad ending of a promising life, but I deserve all the punishment I may get, only I feel my debts must be paid. This sacrifice will do it, and only this. I was faithful until two years ago. Forgive me. Don't publish this." On the same day he wrote to his aunt, to whom he was indebted in a large sum, saying, among other things: "Forgive me for the disgrace I bring upon you, but it is the only way I can pay my indebtedness to you." In addition, he left for the guidance of his executor a memoran-

dum of his business affairs, prepared just before his death, and which tended to show that he was at that time entirely himself.

In view of these and other facts established by the evidence, the court did not err in disaffirming the first and second of plaintiff's points. We may add that, under the charge to the jury, it became unnecessary for them to inquire whether the policies were taken out with the intention of defrauding the insurance company or of committing suicide. The court said to the jury: "What constitutes insanity, in the sense in which we are using the term, has been described to you, and need not be repeated. If this man understood the consequences and effects of what he was doing or contemplating, to himself and to others, if he understood the wrongfulness of it, as a sane man would, then he was sane, so far as we have occasion to consider the subject; otherwise he was not. Here the insured committed suicide, and, as the evidence shows, did it for the purpose, as expressed in his communication to the executor of his will, as well as in letters written to his aunt and his partner, of enabling the executor to recover on the policies, and use the money to pay his obligations. I therefore charge you that if he was in a sane condition of mind at the time, as I have described, able to understand the moral character and consequences of his act, his suicide is a defence to this suit. The only question, therefore, for consideration is this question of sanity. There is nothing else in the case. That he committed suicide, and committed it with a view to the collection of this money from the insurance companies and having it applied to the payment of his obligations, is not controverted, and not controvertible. It is shown by his own declaration, possibly not verbal, but written. The only question, therefore, is whether or not he was in a sane condition of mind, or whether his mind was so impaired that he could not, as I have described, properly comprehend and understand the character and consequences of the act he was about to commit. In the absence of evidence on the subject he must be presumed to have been sane. The presumption of sanity is not overthrown by the act of committing suicide. Suicide

may be used as evidence of insanity, but standing alone it is not sufficient to establish it. . . . If you find him to have been insane, as I have described, your verdict will be for the plaintiff. Otherwise it will be for the defendant."

It thus appears that the case was placed before the jury upon the single issue as to the alleged insanity of the assured at the time he committed suicide, and with a direction to find for the plaintiff if the assured was insane at that time, and for the company if he was then of sound mind.

Assuming that the jury obeyed the instructions of the court, their verdict must be taken as finding that the assured was not insane at the time he took his life. We must then inquire whether the observations of the trial court on the subject of insanity were liable to objection.

We have seen that the plaintiff asked the court to instruct the jury that if the assured intentionally killed himself when his reasoning faculties were so far impaired by insanity that he was unable to understand the moral character of his act, even if he did understand its physical nature, consequence and effect, such self-destruction would not of itself prevent recovery upon the policies.

This was the only instruction asked by the plaintiff which undertook to define insanity, and, as before stated, it was given by the court. But in giving it the court said: "We must understand what is meant and intended by the term 'moral character of his act.' It is a point which has been used by the courts, and is correctly inserted in the term; but it is a term which might be misunderstood. We are not to enter the domain of metaphysics in determining what constitutes insanity, so far as the subject is involved in this case. If Mr. Runk understood what he was doing, and the consequences of his act or acts, to himself as well as to others — in other words, if he understood, as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family and others, and was able to comprehend the wrongfulness of what he was about to do, as a sane man would — then he is to be regarded by you as sane. Otherwise he is not." Substantially the same obser-

vations were made in that part of the charge, which is above given.

The plaintiff insists that the definition of insanity, as given by the trial court, was much narrower than was required or permitted by the decisions of this court. It is said that the impairment not only of the moral vision but also of the will, leaving the deceased in a condition of inability to resist the impulse of self-destruction, has been accepted by this court as describing a phase of insanity or mental unsoundness. One of the cases to which the plaintiff referred in support of this view is *Davis* v. *United States*, 165 U. S. 373, 378, which was a prosecution for murder. It was there held that the accused was not prejudiced by the following instruction given to the jury: "The term 'insanity' as used in this defence means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing; or where, though conscious of it and able to distinguish between right and wrong, and know that the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control." This was substantially what had been held by this court in previous cases. *Life Ins. Co.* v. *Terry*, 15 Wall. 580; *Bigelow* v. *Berkshire Life Ins. Co.*, 93 U. S. 284; *Insurance Co.* v. *Rodel*, 95 U. S. 232; *Manhattan Life Ins. Co.* v. *Broughton*, 109 U. S. 121; *Connecticut Life Ins. Co.* v. *Lathrop*, 111 U. S. 612; *Accident Ins. Co.* v. *Crandal*, 120 U. S. 527.

In *Terry's case*, above cited, — which was an action upon a life policy declaring the policy void if the assured died by his own hand, — it became necessary to instruct the jury on the subject of insanity. The court said: "We hold the rule on the question before us to be this: If the assured, being in the possession of his ordinary reasoning faculties, from anger, pride, jealousy or a desire to escape from the ills of life, intentionally takes his own life, the proviso attaches, and there can be no recovery. If the death is caused by the voluntary

act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable."

Recurring to the ruling of the court in the present case, it is not perceived that the plaintiff had any ground to complain that its definition of insanity was too strict or too narrow. His fifth point, in general terms, defined insanity as being a condition in which the reasoning faculties are so far impaired that the person alleged to be insane when committing self-destruction was unable to understand the moral nature of his act, even if he understood its physical nature. This definition was not rejected. On the contrary, it was accepted, the court at the time making some observations deemed necessary to show what, in law, was meant by the words "moral nature of his act." By those observations, the jury were informed that if the assured understood what he was doing, and the consequences of his act or acts to himself and to others — that is, if he understood, as a man of sound mind would, the consequences to follow from his contemplated suicide, to himself, his character, his family and others, and was able to comprehend the wrongfulness of what he was about to do, as a sane man would — then he was to be regarded as sane; otherwise, not.

It is suggested that the attention of the jury should have been brought specifically or more directly to the fact that unsoundness of mind exists when there is an impulse to take life which weakened mental and moral powers cannot withstand — a condition in which there is no continued existence of a governing will strong enough to resist the tendency to self-destruction. But the words of the charge, although of a general character, substantially embodied these views. The court stated the principal elements of a condition of sanity as contrasted with insanity. What it said was certainly as specific as the instruction asked by the plaintiff. If the plain-

tiff desired a more extended definition of insanity than was given, his wishes, in that respect, should have been made known. The court having affirmed his view of what was evidence of insanity, and such affirmance having been accompanied by observations that brought out with more distinctness and fulness what was meant by the words "moral character of his act," the plaintiff has no ground to complain; for nothing said by the court upon the question of insanity was erroneous in law or inconsistent with that which the plaintiff asked to be embodied in the charge.

No error of law having been committed in respect of the issue as to the insanity of the assured, it is to be taken as the result of the verdict that he was of sound mind when he took his life.

This brings us to the question whether the insurance company was liable — assuming that it was not a part of the contract enforceable in Pennsylvania, that the assured should "not die by his own act whether sane or insane," within two years from the date of the policy.

It is contended that the court erred in saying to the jury, as in effect it did, that intentional self-destruction, the assured being of sound mind, is in itself a defence to an action upon a life policy, even if such policy does not, in express words, declare that it shall be void in the event of self-destruction when the assured is in sound mind. But is it not an implied condition of such a policy that the assured will not purposely, when in sound mind, take his own life, but will leave the event of his death to depend upon some cause other than wilful, deliberate self-destruction? Looking at the nature and object of life insurance, can it be supposed to be within the contemplation of either party to the contract that the company shall be liable upon its promise to pay, where the assured, in sound mind, by destroying his own life, intentionally precipitates the event upon the happening of which such liability was to arise?

Life insurance imports a mutual agreement, whereby the insurer, in consideration of the payment by the assured of a named sum annually or at certain times, stipulates to pay a

larger sum at the death of the assured. The company takes into consideration, among other things, the age and health of the parents and relatives of the applicant for insurance, together with his own age, course of life, habits and present physical condition; and the premium exacted from the assured is determined by the probable duration of his life, calculated upon the basis of past experience in the business of insurance. The results of that experience are disclosed by standard life and annuity tables showing at any age the probable duration of life. These tables are deemed of such value that they may be admitted in evidence for the purpose of assisting the jury in an action for personal injury, in which it is necessary to ascertain the compensation the plaintiff is entitled to recover for the loss of what he might have earned in his trade or profession but for such injury. *Vicksburg & Meridian Railroad* v. *Putnam,* 118 U. S. 545, 554. If a person should apply for a policy expressly providing that the company should pay the sum named if or in the event the assured, at any time during the continuance of the contract, committed self-destruction, being at the time of sound mind, it is reasonably certain that the application would be instantly rejected. It is impossible to suppose that an application of that character would be granted. If experience justifies this view, it would follow that a policy stipulating generally for the payment of the sum named in it upon the death of the assured, should not be interpreted as intended to cover the event of death caused directly and intentionally by self-destruction whilst the assured was in sound mind, but only death occurring in the ordinary course of his life.

That the parties to the contract did not contemplate insurance against death caused by deliberate, intentional self-destruction when the assured was in sound mind, is apparent from the "provisions, requirements and benefits" referred to in and made part of the policy. They show that the policy was issued on the twenty-year distribution plan, and was to be credited with its distributive share of surplus apportioned at the expiration of twenty years from the date of issue; that, after three full annual premiums were paid, the company

would, upon the legal surrender of the policy, before default in the payment of any premium, or within six months thereafter, issue a non-participating policy for a paid up insurance, payable as provided, for the amount required by the provisions of the New York statute of May 21, 1879, Laws of New York, c. 347 ; that the assured was entitled to surrender the policy at the end of the first period of twenty years "and the full reserve computed by the American table of mortality, and four per cent interest, and the surplus, as defined above, will be paid therefor in cash ; " that if the assured surrendered the policy the total cash value at the option of the policy holder should be applied " to the purchase of an annuity for life, according to the published rates of the company at the time of surrender ; " that after two years from the date of the policy the only conditions that should be binding on the holder of the policy were that " he shall pay the premiums at the time and place and in the manner stipulated in the policy, and that the requirements of the company as to age, and military or naval service in time of war shall be observed ; " that in all other respects, if the policy matured after the expiration of two years, the payment of the sum insured should not be disputed ; and that the party whose life was insured should always wear a suitable truss. These provisions of the contract tend to show that the death referred to in the policy was a death occurring in the ordinary course of the life of the assured, and not by his own violent act designed to bring about that event.

In the case of fire insurance it is well settled that although a policy, in the usual form, indemnifying against loss by fire, may cover a loss attributable merely to the negligence or carelessness of the insured, unaffected by fraud or design, it will not cover a destruction of the property by the wilful act of the assured himself in setting fire to it, not for the purpose of avoiding a peril of a worse kind but with the intention of simply effecting its destruction. Much more should it be held that it is not contemplated by a policy taken out by the person whose life is insured and stipulating for the payment of a named sum to himself, his executors, administrators, or assigns,

that the company should be liable, if his death was intentionally caused by himself when in sound mind. When the policy is silent as to suicide, it is to be taken that the subject of the insurance, that is, the life of the assured, shall not be intentionally and directly, with whatever motive, destroyed by him when in sound mind. To hold otherwise is to say that the occurrence of the event upon the happening of which the company undertook to pay, was intended to be left to his option. That view is against the very essence of the contract.

There is another consideration supporting the contention that death intentionally caused by the act of the assured when in sound mind — the policy being silent as to suicide — is not to be deemed to have been within the contemplation of the parties; that is, that a different view would attribute to them a purpose to make a contract that could not be enforced without injury to the public. A contract, the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the foundation of its judgment. If, therefore, a policy — taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators or assigns — expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him, or to whom he was indebted.

Is the case any different in principle if such a policy is silent as to suicide, and the event insured against — the death of the assured — is brought about by his wilful, deliberate act when in sound mind? Light will be thrown on this question by some of the adjudged cases, having more or less bearing upon the precise point now before this court for determination.

The plaintiff insists that the question just stated is answered in the affirmative by the opinion in *Life Ins. Co.* v. *Terry,*

15 Wall. 580. As before stated, that was an action upon a life policy, containing the condition that it should be void if the assured should "die by his own hand;" and the controlling question was whether the condition embraced the case of an assured who committed self-destruction at a time when his reasoning faculties were so far impaired that he was unable to comprehend the moral character, the general nature, consequences and effect of the act he was about to commit, or when he was impelled thereto by an insane impulse which he had not the power to resist. There was no question in that case as to the effect upon the rights of the parties of intentional self-destruction, where the policy contained no provision as to suicide. In the course of the review of the adjudged cases reference was made in the opinion of this court to *Borradaile* v. *Hunter*, 5 Mann. & Gr. 639, and also to *Hartman* v. *Keystone Ins. Co.*, 21 Penn. St. 466, 479. In the former case it appeared that the assured threw himself into the Thames and was drowned, and the jury found that he voluntarily threw himself into the water, knowing at the time that he should thereby destroy his life, and intending thereby to do so, but at the time of committing the act he was not capable of judging between right and wrong. The question was as to the liability of the insurance company on a policy issued to the assured containing a clause or proviso that the policy should be void if "the assured should die by his own hands, or by the hands of justice, or in consequence of a duel." Maule, Erskine and Coltman, JJ., held that the company was not liable, while Tindall, C. J., was of the opinion that the proviso embraced cases of felonious suicide only, and not cases of self-destruction whilst the assured was under the influence of frenzy, delusion or insanity. In the latter case it appeared that the assured committed self-destruction by taking arsenic. The Supreme Court of Pennsylvania held that there could be no recovery, Chief Justice Black saying: "The conditions of the policy are, that it shall be null and void 'if the assured shall die by his own hand, in or in consequence of a duel, or by the hands of justice,' etc. The plaintiff argues that the first clause here quoted

does not embrace a suicide committed by swallowing arsenic. Where parties have put their contracts in writing their rights are fixed by it. But the contract is what they meant it to be, and when we can ascertain their meaning from the words they have used, we must give it effect. One rule of interpretation is, that we must never attribute an absurd intent if a sensible one can be extracted from the writing. No absurdity could be greater than a stipulation against suicide in a duel. The words 'die by his own hand,' must, therefore, be disconnected from those which follow. Standing alone, they mean any sort of suicide. Besides this, the court was very plainly right in charging that if no such condition had been inserted in the policy, a man who commits suicide is guilty of such a fraud upon the insurers of his life that his representatives cannot recover for that reason alone." Mr. Justice Hunt, delivering the opinion in *Terry's case*, made an observation in relation to the two cases just cited which is supposed to be favorable to the plaintiff's contention. He said: "In *Hartman* v. *Keystone Ins. Co.* the doctrine of *Borradaile* v. *Hunter* was adopted, with the confessedly unsound addition that suicide would avoid a policy although there was no condition to that effect in the policy." This observation of the learned justice was irrelevant to the case before the court, and cannot be regarded as determining the point in judgment. If it was meant there could be a recovery by the personal representative of an assured who took out the policy, and who, in sound mind, took his own life — the policy being silent in reference to suicide — we cannot concur in that view.

In *N. Y. Mut. Life Ins. Co.* v. *Armstrong*, 117 U. S. 591, 600, which was an action by the assignee of a life policy, the defence, in part, being that the assignee murdered the assured in order to get the benefit of the policy, Mr. Justice Field, speaking for this court, said: "Independently of any proof of the motives of Hunter [the assignee] in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it, when, to secure its immediate payment, he murdered the assured. It would be a reproach to

the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired."

In *Hatch* v. *Mutual Life Ins. Co.*, 120 Mass. 550, 552, it appears that a policy of insurance on the life of a married woman provided that "if the said person whose life is hereby insured shall die by her own act or hand, whether sane or insane, the policy should be null and void." It was in proof that the assured died by reason of a miscarriage produced by an illegal operation performed upon and voluntarily submitted to by her with intent to cause an abortion, and without any justifiable medical reason for such an operation. The court, observing that this voluntary act on the part of the assured was condemned alike by the laws of nature and by the laws of all civilized States, and was known by the assured to be dangerous to life, said: "We are of opinion that no recovery can be had in this case, because the act on the part of the assured causing death was of such a character that public policy would preclude the defendant from insuring her against its consequences; for we can have no question that a contract to insure a woman against the risk of her dying under or in consequence of an illegal operation for abortion would be contrary to public policy, and could not be enforced in the courts of this Commonwealth." The report of the case shows that it was decided without reference to the questions raised by the special clauses of the policy.

The subject was considered by the Supreme Court of Alabama in *Supreme Commandery &c.* v. *Ainsworth*, 71 Alabama, 436, 446. Chief Justice Brickell, delivering the unanimous judgment of that court, said:

"In all contracts of insurance, there is an implied understanding or agreement that the risks insured against are such as the thing insured, whether it is property, or health, or life, is usually subject to, and the assured cannot voluntarily and intentionally vary them. Upon principles of public policy and morals, the fraud, or the criminal misconduct of the assured is, in contracts of marine or of fire insurance, an

implied exception to the liability of the insurer. *Waters* v. *Merchants' Louisville Ins. Co.,* 11 Pet. 213; *Citizens' Ins. Co.* v. *Marsh,* 41 Penn. St. 386; *Chandler* v. *Worcester Mut. Fire Ins. Co.,* 3 Cush. 328. Death, the risk of life insurance, the event upon which the insurance money is payable, is certain of occurrence; the uncertainty of the time of its occurrence is the material element and consideration of the contract. It cannot be in the contemplation of the parties, that the assured, by his own criminal act, shall deprive the contract of its material element; shall vary and enlarge the risk, and hasten the day of payment of the insurance money. The doctrine asserted in *Fauntleroy's case,* that death by the hands of public justice, the punishment for the commission of crime, avoids a contract of life insurance, though it is not so expressed in the contract, has not, so far as we have examined, been questioned, though the case itself may have led to the very general introduction of the exception into policies. The same considerations and reasoning which support the doctrine seem to lead, of necessity, to the conclusion, that voluntary, criminal self-destruction, suicide, as defined at common law, should be implied as an exception to the liability of the insurer, or, rather, as not within the risks contemplated by the parties, reluctant as the courts may be to introduce by construction or implication exceptions into such contracts, which usually contain special exceptions." Again: "The fair and just interpretation of a contract of life insurance, made with the assured, is, that the risk is of death proceeding from other causes than the voluntary act of the assured, producing, or intended to produce it;" and that "the extinction of life by disease, or by accident, not suicide, voluntary and intentional, by the assured, while in his senses, is the risk intended; and it is not intended that, without the hazard of loss, the assured may safely commit crime."

In support of the general proposition that the law will not enforce contracts and agreements that are against the public good, and, therefore, are forbidden by public policy, reference is often made to the case of *The Amicable Society &c.* v. *Bolland,* 4 Bligh, N. S. 194, 211, known as *Fauntleroy's case.*

That was an action by assignees in bankruptcy to secure the amount due on a policy of insurance stipulating for the payment of a certain sum, upon the death of Fauntleroy, to his executors, administrators or assigns. The assured was convicted of forgery, and for that offence was executed. The Lord Chancellor, after observing that the question was whether the parties representing and claiming under one who effects insurance upon his life, and afterwards commits a capital felony, for which he was tried and executed, could recover the amount named in the policy, said: "It appears to me that this resolves itself into a very plain and simple consideration. Suppose that in the policy itself this risk had been insured against: that is, that the party insuring had agreed to pay a sum of money year by year, upon condition, that in the event of his committing a capital felony, and being tried, convicted and executed for that felony, his assignees shall receive a certain sum of money — is it possible that such a contract could be sustained? Is it not void upon the plainest principles of public policy? Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes? namely, the interest we have in the welfare and prosperity of our connections? Now, if a policy of that description, with such a form of condition inserted in it in express terms, cannot, on grounds of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, that we can sustain such a claim? Can we, in considering this policy, give to it the effect of that insertion, which if expressed in terms would have rendered the policy, as far as that condition went at least, altogether void?"

Referring to that case, Bunyon in his work on Life Insurance says: "It would render those natural affections which make every man desirous of providing for his family, an inducement to crime; for the case may be well supposed of a person insuring his life for that purpose, with the intention of committing suicide. For a policy, moreover, to remain in force when death arose from any such cause would be a fraud

upon the insurers, for a man's estate would thereby benefit by his own felonious act. Hence the rule of law when there is no condition whatever, but in that case, if the suicide or self-destruction takes place when the assured is *insane* and not accountable for his acts, the rule arising from public policy does not apply, and his representatives are entitled to the policy money." 3d ed. p. 96; 2d ed. p. 72.

In *Moore* v. *Woolsey*, 4 Ell. & Bl. 243, 254, in which the question was as to the rights of an assignee under a policy providing that if the assured should die by duelling or by his own hand, or the hand of justice, it should be void as to the personal representative of the assured, Lord Campbell, C. J., said that, "if a man insures his life for a year, and commits suicide within the year, his executors cannot recover on the policy, as the owner of a ship who insures her for a year cannot recover upon the policy if within the year he causes her to be sunk: a stipulation that, in either case, upon such an event the policy should give a right of action, would be void."

For the reasons we have stated, it must be held that the death of the assured, William M. Runk, if directly and intentionally caused by himself, when in sound mind, was not a risk intended to be covered, or which could legally have been covered, by the policies in suit.

The case presents other questions, but they are of minor importance, and do not affect the substantial rights of the parties.

We perceive no error of law in the record, and the judgment is

*Affirmed.*

MR. JUSTICE PECKHAM did not take part in the consideration or decision of this case.