**In re BOWERS.**

No. 16875.

District Court, E. D. Pennsylvania.

Nov. 7, 1934.

---

[1] Oral opinion.

Edwin K. Kline, of Allentown, Pa., for bankrupt.

Henry L. Snyder and Julius M. Rapoport (of Groman & Rapoport), both of Allentown, Pa., for trustee.

### KIRKPATRICK, District Judge.

The order of the referee here for review directs the trustee to turn over to the bankrupt three "deferred annuity" contracts purchased by the latter. The order was based upon the referee's conclusion that all money realizable upon the contracts was wholly exempt from the claims of creditors by virtue of the Pennsylvania statutes relating to the exemption of life insurance policies or annuity contracts and by section 6 of the Bankruptcy Act (11 USCA § 24). The three contracts involved are all alike and may be treated as one for the purpose of this review.

The Pennsylvania legislation upon this subject was fully considered by this court in Re Lang, 20 F.(2d) 236, and in Re Rose, 24 F.(2d) 253, both of which decisions were affirmed by the Circuit Court of Appeals, 24 F.(2d) 254. It was held in those cases that the cash surrender value of all such policies and contracts as well as the amount payable upon the death of the insured was exempt, and this although the insured reserved the right to change the beneficiary at will and could collect the cash surrender value without the benefi-ciary's consent, thus entirely destroying the latter's interest.

The only question in this case is whether or not the contract here involved comes within the terms of the Pennsylvania exemption laws. The Act of June 28, 1923, P. L. 884 (40 PS Pa. § 517), is the last of the statutes dealing with the subject, and it provides that "the net amount payable under any policy of life insurance or under any annuity contract upon the life of any person, heretofore or hereafter made for the benefit of or assigned to the wife or children or dependent relative of such person, shall be exempt from all claims of the creditors of such person arising out of or based upon any obligation created after the passage of this act, whether or not the right to change the named beneficiary is reserved by or permitted to such person."

The bankrupt purchased these contracts by making three lump-sum payments aggregating $18,000, the last one approximately a year before his adjudication. The trustee does not contend that he was insolvent at the time and no question of fraudulent transfer of the money is raised.

The contract bears a superficial resemblance, at least in some of its features, to a policy of life insurance. It describes itself as a "deferred annuity with life or refund annuity beginning at optional age. Benefit payable in case of death before annuity begins. Single premiums. Annual dividends." The terminology used is that of life insurance contracts. The money paid by the bankrupt for the purchase of the contract is called a "single premium * * * representing * * * premium-units." The owner of the contract is called "the annuitant"; his wife "the beneficiary."

The contract gave the bankrupt the following rights:

(1) If and when he reached the age of sixty-five (he was thirty-seven when he took the contract), he would be entitled to receive an annuity in a fixed amount, payable to him in monthly installments, for the rest of his life.

(2) At any time after the first contract year before reaching the age of sixty-five he might surrender the contract and receive back a sum of money (fixed by Schedule C and called "cash surrender value"). This amount was, for the first two years, slightly less than the amount deposited, but it increased with the age of the policy. After the second year it would be

the amount deposited plus a trifling amount of interest.

Obviously, neither of these provisions was for his wife's benefit. Her interest in the transaction was:

(3) If, and only if, the annuitant died at any time before age sixty-five (when his life annuity began), she would receive a "death benefit" which, during the first five years the contract was in force, was a little larger than the cash surrender value and thereafter exactly the same. See note 1[1].

Thus, as things stood at the date of the adjudication, the bankrupt, if he lived to age sixty-five, would get a life annuity beginning at that age, and upon his death thereafter his wife would get nothing. See note 2.[2] If he died before he reached age sixty-five his wife would be paid an amount somewhat less than that which· he had paid for the contract, with interest.

Was this contract within the meaning of the statute a policy of life insurance or an annuity contract, for the benefit of the wife? It was, of course, an annuity contract but, so far as that feature is concerned, it was clearly not for the benefit of the wife and so not within the statute. And I do not think that the incidental so-called death benefit feature brings it within the statute, because, fundamentally, it is not a contract or policy of life insurance at all.

The basic principle upon which life insurance is written is the distribution of liability for losses among a large number of persons subject to like risks who contribute, through the payment of premiums, to a common fund. The contribution required of each is in theory proportionate to the risk of loss which he imposes upon the common fund. In no individual instance can the actual risk of loss be determined accurately,· but in a sum total composed of many risks the effect upon the entire fund of· certain constant factors (present in individual cases) can be accurately estimated, and consequently the proper contribution of each policyholder be fixed. Such factors are the age and state of health of each insured and, to a lesser degree, his occupation, habits, and character. By them is determined the amount of the consideration or premium which each insured pays for his protection. The insured's contribution usually consists of periodic payments, but the installments may be anticipated by payment in advance. Even if this is done, however, the total amount to be paid still bears some relation to the risk of loss which the individual insured imposes upon the fund.

---

[1] Note 1. The contract gave the bankrupt certain options in addition to the rights stated. Thus—

(a) Upon reaching the age of fifty and thereafter until he reached the age of seventy, he might at any time elect to take a life annuity in an amount fixed by the contract (Schedule A), or

(b) Instead of the foregoing, he might elect to take what was called a "refund annuity," being really a life annuity in a somewhat smaller amount.

(c) If the insured, having elected the refund annuity referred to in (b), should die between the ages of fifty and seventy, the annuity would be continued to the wife until the annuity payments equaled the amount of the death benefits or cash surrender value. This, so far as the wife was concerned, would be simply a payment to her of the death benefit (diminished by annuity payments already made to the annuitant) in installments instead of a lump sum.

The effect of these options need not be considered here because we have to do with the contract as it was on the date of the bankrupt's adjudication, not what he might, at some future time, have made it.

[2] Note 2. The interpretation of the policy with regard to this last point is disputed, and it is true that Schedule C provides for death benefits during fifty-five successive contract years, twenty-seven of which would in this case fall after the insured had reached the age of sixty-five and while the annuity was being paid him. This appears to be in conflict with the general provisions of the contract. It can only be reconciled with these provisions by assuming that it contemplates the possibility of the contract being taken out for the benefit of the annuitant at any age beginning with ten years. In any event, the first page of the contract is perfectly clear and is controlling. It provides that: "If the Annuitant dies prior to the due date of the first Annuity payment hereunder, the Society will * * * pay to his wife * * * a death benefit *· * *," and the description of the contract itself printed at the bottom contains the provision "Benefit Payable in Case of Death Before Annuity Begins." This distinguishes the contract from that in Re Schaefer (D. C.) 189 F. 187, where the policy provided that no matter when the annuitant died his wife received the death benefit.

The Supreme Court in Ritter v. Mutual Life Insurance Company, 169 U. S. 139, 18 S. Ct. 300, 304, 42 L. Ed. 693, said that: "Life insurance imports a mutual agreement, whereby the insurer, in consideration of the payment by the assured of a named sum annually, or at certain times, stipulates to pay a larger sum at the death of the assured. The company takes into consideration, among other things, the age and health of the parents and relatives of the applicant for insurance, together with his own age, course of life, habits, and present physical condition; and the premium exacted from the assured is determined by the probable duration of his life, calculated upon the basis of past experience in the business of insurance." The court was dealing with the question whether acceleration of the risk by suicide was contemplated by the fundamental nature of the contract, but the definition brings out clearly that apportionment of premium to risk is of the essence of the relation.

This contract (I am now talking about the death benefit or ostensible life insurance part of it) entirely lacks this characteristic. The "premium" paid bears no relation for example to the state of health of the insured. No physical examination was required, no inquiry as to habits or occupation made. The age of the insured did, no doubt, enter into the fixing of the amount but that was entirely because of annuity feature with which we are not now concerned. The "premium" was not a real premium, and it was not apportioned to the risk for the obvious reason that there was no risk. The death of the insured, no matter how early it might occur, involved no additional hazard to the company. All it was bound to do in such case was to return the insured's money to the person designated by him, plus an almost negligible amount of interest—very much less than could have been obtained in the most conservative investments.

It would hardly be contended I think that if this bankrupt had deposited $18,000 with a bank or trust company subject at all times to be drawn out by him upon demand, with the direction that upon his death the deposit should be paid to his wife, he had entered into a contract of life insurance. Yet, except for the added annuity and the fact that the depository is an insurance company, that comes very near to being what the annuitant in this case has done. Actually the contract has more of the characteristics of such a deposit than of a life insurance policy, and calling the wife the beneficiary and the deposit a premium and the contract a policy cannot make it the latter.

There is no question of fraud involved in this case. For all that appears the insured may have been amply solvent when he deposited his money with the insurance company. At that time he might have given the money to his wife outright, or he might have established a spendthrift trust payable to her upon his death. In either case the fund would have been removed from the reach of creditors but, be it noted, at the cost of his parting with the title and control of it. However, he did neither of these things. His bankruptcy finds him in full control, through the cash surrender value provision, of a sum of money deposited by him with the company, intact and undiminished except by a portion of interest which he might otherwise have obtained.

■■ He seeks to withhold the fund from his creditors upon the sole ground that it is exempt under the law. Thus the question becomes solely one of construing the statute. The guiding principle of all statutory construction is to effectuate the main purpose for which the law was enacted. The purpose of the insurance exemption statutes was to permit and encourage men to make provision for their families through the medium of life insurance, but not otherwise. Where the debtor has resorted to that medium, and where his transaction is genuinely a contract of life insurance, the statute should have, and has always been given, a liberal construction. But there is no reason to extend its terms to make it cover transactions which are not life insurance. In fact, the broader policy of the law, that the man's property should answer for his just debts, forbids it. It could never have been the intention to encourage the evasion of this responsibility by exempting ordinary investments of which the debtor retains full dominion and which he can enjoy at will merely because they are given the guise and name of life insurance.

■ My conclusions are that this contract is an annuity contract for the sole benefit of the bankrupt, that the provision for payment to his wife upon his death before reaching the age of sixty-five does not make it a contract of life insurance, and that it is not such a contract within the meaning of the Pennsylvania Act of June

28, 1923, P. L. 884, and not exempt by virtue of that statute.

In the foregoing discussion the effect of the Pennsylvania Act of May 3, 1917, P. L. 112, § 1, Purdon, tit. 40, § 515 (40 PS Pa. § 515), has not been considered. That act exempts annuity contracts issued to solvent persons "not exceeding in income or return therefrom one hundred dollars ($100) per month." The extent to which this statute applies (if it applies at all) to the contracts involved in this review is not determined for the reason that, whatever it does, it does not exempt them to their full amount and therefore does not support the referee's order which was to deliver the contracts to the bankrupt, released, and discharged, as an asset of the estate.

The order of this court, therefore, is that the order of the referee be reversed.