STUCKEY POTTS AND DEPARTMENT OF LABOR AND IN-
DUSTRY, DIVISION OF EMPLOYMENT SECURITY, DIS-
ABILITY INSURANCE SERVICE, PLAINTIFFS-RESPOND-
ENTS, v. BARRETT DIV., ALLIED CHEMICAL & DYE
CORP., AND THE TRAVELERS INSURANCE COMPANY,
DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued January 27, 1958—Decided February 4, 1958.

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. John W. O'Brien* argued the cause for appellants (*Messrs. O'Brien, Brett & O'Brien,* attorneys).

*Mr. David M. Satz, Jr.,* Deputy Attorney-General, argued the cause for respondent Division of Employment Security (*Mr. Grover C. Richman, Jr.,* Attorney-General, attorney;

*Mr. Donald M. Altman,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Defendants Barrett Division of the Allied Chemical & Dye Corporation, and its insurer, The Travelers Insurance Company, appeal from a determination and order of the Division of Employment Security, Disability Insurance Service, in the Department of Labor and Industry, granting plaintiff Potts disability benefits under the Private Plan section of the Temporary Disability Benefits Law, *N. J. S. A.* 43:21–25 *et seq.*

Travelers had in October 1952 issued a policy under the Private Plan section (*N. J. S. A.* 43:21–32 to 36) covering Barrett Division's employees. The policy provided, in part, that the company would pay certain disability benefits

"If an Employee shall be disabled and prevented from performing any and every duty pertaining to the Employee's work or employment as result of *accidental bodily injury or bodily disease* not hereinafter excepted, * * *." (Italics ours)

We are advised that there apparently was some question as to whether this provision was sufficiently broad to cover mental disease. At the request of the Approval and Termination Section of the Division of Employment Security, Travelers on October 20, 1955 amended the paragraph to provide that disability benefits would be paid

"If an insured Employee shall be disabled and prevented from performing the duties of his employment as a result of *injury or sickness* not hereinafter excepted, * * *." (Italics ours)

On December 21, 1956 Potts, an employee of the Barrett Division, shot and killed a woman and then, in an apparent attempt to commit suicide, turned the gun upon himself and shot out his right eye. He was charged with murder and confined to the city hospital until February 7, 1957, when he was transferred to the county jail after arraignment. He re-entered the hospital on May 1, 1957 because of an infection in the wound, and remained there under

medical care and treatment until May 10 when he was returned to the jail. Potts had meanwhile been indicted for murder and pleaded not guilty, but he later withdrew the plea, entered a plea of *non vult* to second degree murder, and received a sentence of 15 to 20 years in State Prison.

Potts filed a claim for disability benefits on February 27, 1957, describing his disability as "Self inflicted wound." Travelers denied payment, claiming that a self-inflicted wound was not covered under its policy. Potts then filed a complaint with the Division of Employment Security, Disability Insurance Service. A hearing was held and a determination of facts and order filed awarding disability benefits to Potts from December 21, 1956 through February 28, 1957, and from May 1 through May 9, 1957, less the required waiting period. From this order defendants appeal.

The first reason assigned by the hearing officer for awarding disability benefits was the above-quoted change in the coverage of the policy. He held that the insurer, by removing the words "accidental bodily injury or bodily disease" from its policy and substituting in their place the words "injury or sickness," indicated an intention to pay disability benefits under circumstances such as are here present.

The hearing officer next pointed out that although the Legislature had provided that no benefits were payable under the State Plan "for any period of disability due to willfully and intentionally self-inflicted injury, or to injury sustained in the perpetration by the claimant of a high misdemeanor," *N. J. S. A.* 43:21–39(*d*), it had not extended this exception to Private Plan policies. A Private Plan insurer could be more liberal in its policy limitations than the State Plan, and this by reason of *N. J. S. A.* 43:21–32(*b*), which provides that the Division of Employment Security shall approve a private plan if it finds that the eligibility requirements for benefits thereunder "are no more restrictive than is provided in this act for benefits payable by the State plan." Although *N. J. S. A.* 43:21–39 lists eight exclusions under the State Plan, Travelers had chosen to include only five in its Barrett Division policy. Among the three omitted was

exclusion (d), above. The hearing officer held that if the insurer wanted to take advantage of any of the State Plan exceptions it should have included them in its own policy, and this would have been approved since they were no more restrictive than the State Plan. The omission of exception (d), he said, indicated a waiver of the exception by Travelers.

Finally, the hearing officer ruled that payment of disability benefits in this case would not be against public policy. He found no relationship in the application of the stated purposes of the Temporary Disability Benefits Law, as set out in *N. J. S. A.* 43:21–26, to the facts of the case. In his view, the public policy of the law, as declared by that section, "requires payment of reasonable cash sickness benefits to eligible individuals suffering an accident or illness which is not compensable under the Workmen's Compensation Act."

In seeking a reversal of the agency order and a judgment dismissing the Potts' claim, defendants contend that one who willfully injures himself in the course of committing a crime is not entitled to benefits, because public policy precludes recovery. They further argue that self-inflicted injuries are not within the intendment of the Temporary Disability Benefits Law. The Attorney-General, appearing for the Division of Employment Security, contends that benefits were properly awarded to Potts because (1) the policy being unambiguous, the court is bound to enforce the clear terms of the contract as it finds them; (2) insurance contracts should be liberally construed in favor of the beneficiary, exclusion clauses being strictly construed against the insurer; and (3) because of the reasons given by the hearing officer.

The Private Plan policy issued by Travelers had, of course, been submitted to and approved by the Division of Employment Security under *N. J. S. A.* 43:21–32, relating to the establishment of private plans. Since it was issued pursuant to the Temporary Disability Benefits Law, it is to be read in the light of the stated purposes of the act, as set out in *N. J. S. A.* 43:21–26. This section provides that the act "shall be liberally construed as remedial legisla-

tion enacted upon the following declarations of public policy and legislative findings of fact," which are then set out. The public policy of New Jersey is declared to be the protection of employees against the "suffering and hardship generally caused by *involuntary unemployment*." The Legislature found that the Unemployment Compensation Law, *R. S.* 43:21–1 *et seq.*, as amended, failed to provide protection against wage loss suffered because of inability to perform the duties of a job interrupted by illness. Nor was there "any other comprehensive and systematic provision for the protection of working people against loss of earnings due to *nonoccupational sickness or accident*." Finding that the prevalence and incidence of nonoccupational sickness and accident among employed people was greatest among the lower income groups, the Legislature declared that it was therefore "desirable and necessary to fill the gap in existing provisions for protection against the loss of earnings caused by *involuntary unemployment*, by extending such protection to meet the hazard of earnings loss due to inability to work caused by *nonoccupational sickness or accident*." The policy section, *N. J. S. A.* 43:21–26, then closes with the statement that "a system, enacted under the police power, is hereby established, requiring the payment of reasonable cash benefits to eligible individuals suffering *accident or illness* which is not compensable under the workmen's compensation law [*R. S.* 34:1–1 *et seq.*, as amended]." (All italics ours)

*N. J. S. A.* 43:21–27 defines "disability" to mean such disability as is compensable under section 5 of the Temporary Disability Benefits Law. Section 5 (*N. J. S. A.* 43:21–29) provides that

"Disability shall be compensable subject to the limitations of this act, where a covered individual suffers an *accident or sickness* not arising out of and in the course of his employment or if so arising not compensable under the workmen's compensation law (Title 34 of the Revised Statutes), and resulting in his total inability to perform the duties of his employment." (Italics ours)

The Temporary Disability Benefits Law thus seeks to fill up the gap left by the Unemployment Compensation

and the Workmen's Compensation Acts so as to protect working people against loss of earnings caused by "involuntary unemployment," by extending protection to meet the hazard of earnings loss due to inability to work caused by "nonoccupational sickness or accident." This stated purpose is controlling; it pervades the operation of State Plan and private plans alike.

■ Potts' inability to work was not an "involuntary unemployment," for he brought his disability upon himself through willful and intentional self-injury. And his was certainly not a "nonoccupational sickness or accident," but a physical incapacity deliberately induced by his own hand. There is not the slightest suggestion that he was insane or temporarily deranged at the moment he shot himself, in which case other considerations might well apply.

■ Not only does the payment to Potts of temporary disability benefits for his self-inflicted injury run counter to the intendment of the act, broadly beneficent as it is, but it is contrary to public policy.

Suicide (*felo de se*) was a felony at common law. It ranked as an infamous crime, the penalty being forfeiture of the estate of the decedent and ignominious burial in the highway with a stake driven through the body. Such forfeiture was abolished by our first Constitution of 1776, *Art.* XVII, and remains proscribed to this day. *N. J. S.* 2A :152–2. Attempt at suicide was likewise an indictable offense at common law, and was designated a misdemeanor in this State. *N. J. S.* 2A :85–1 and 2A :85–5; *State v. Carney,* 69 *N. J. L.* 478 (*Sup. Ct.* 1903); *State v. LaFayette,* 15 *N. J. Misc.* 115, 188 *A.* 918 (*C. P.* 1937); and see *State v. Ehlers,* 98 *N. J. L.* 236, 241 (*E. & A.* 1922).

· In 1957 the Legislature downgraded suicide attempt to disorderly conduct. *L.* 1957, *c.* 34; *N. J. S.* 2A :170–25.6. (The Statement attached to the enacted bill, *Senate No.* 28, explains that such an attempt was a misdemeanor under the existing general provisions relating to offenses of an indictable nature at common law, *N. J. S.* 2A :85–1 and 5. Since grand juries usually failed to indict, it was thought

that such cases could be dealt with more practically in the municipal courts.)

Although attempted suicide has thus been downgraded to disorderly conduct in the interest of a more practical administration of criminal justice, self-destruction or an attempt at self-destruction still remains unlawful. Such an act, which would destroy life itself, is contrary to every moral and religious principle, and has always run counter to the law of this State. At the time of the shooting, moreover, the act was still a misdemeanor.

We have noted the absence of any contention that Potts was insane or temporarily deranged. Were that the case and the policy (as here) contained no provision whatever relating to the suicide, sane or insane, recovery would ordinarily be allowed. See 2 *Richards on Insurance* (*5th ed.* 1952), § 240, *p.* 830; 6 *Couch, Cyclopedia of Insurance Law,* § 1262a, *p.* 4615 (1930); 1 *Appleman, Insurance Law and Practice,* § 365, *p.* 433 (1941); *Vance on Insurance* (*3d ed.* 1951), § 94, *p.* 563. Nor do we have a situation where benefits under the policy, silent as to suicide, are payable to an innocent third person as beneficiary, in which case our courts have allowed recovery. *Campbell v. Supreme Conclave Improved Order Heptasophs,* 66 *N. J. L.* 274 (*E. & A.* 1901); *Sautter v. Supreme Conclave, Improved Order of Heptasophs,* 76 *N. J. L.* 763 (*E. & A.* 1908); *Angersbach v. South River Police Pension Commission,* 122 *N. J. L.* 1 (*Sup. Ct.* 1939); *Leogrande v. Societa M. S. Fratellanza Italiana,* 133 *N. J. L.* 51 (*Sup. Ct.* 1945), affirmed *Ibid.,* 133 *N. J. L.* 558 (*E. & A.* 1946). And see, 2 *Richards on Insurance* (*5th ed.* 1952), § 240, *p.* 828; 6 *Couch on Insurance,* § 1262a, *p.* 4614 (1930); 1 *Appleman, Insurance Law and Practice,* § 367, *p.* 440 (1941); *Vance on Insurance* (*3d ed.* 1951), § 94, *p.* 562; 29 *Am. Jur., Insurance,* § 914, *p.* 697 (1940).

The Attorney-General stresses the argument adopted by the hearing officer that in setting up its private plan Travelers was entirely free, under *N. J. S. A.* 43:21–32(*b*), to adopt the exception found in the State Plan against payment of

benefits where the disability was due to "willfully and intentionally self-inflicted injury or to injury sustained in the perpetration by the claimant of a high misdemeanor" (*N. J. S. A.* 43:21–39(*d*)). Implicit in this argument is the thought that if there indeed was a public policy against paying benefits under a private plan for disability suffered through an attempted suicide, the Legislature would surely have provided that such an exception be included in any Private Plan arrangement.

The argument, in short, is that any such public policy as may exist against suicide or attempted suicide can apply only to the State Plan; if a private plan fails to mention the exception, there is nothing in public policy to defeat the payment of disability benefits. This ignores the continuing and viable presence in our commonwealth of a policy dictated by the highest considerations of morality and religion. That policy intimately and directly reflects the State's proper concern for the wellbeing and preservation of its citizens.

This case squarely poses the question which time and again has arisen in life and in law: Shall a man be allowed to profit by his own wrong? The answer, at least in our own State, has been that he may not. As Judge Jayne (then Vice-Chancellor) said in *Whitney v. Lott,* 134 *N. J. Eq.* 586, 589 (*Ch.* 1944), the doctrine that no one can obtain an advantage by his own wrong, "so essential to the observance of morality and justice, has been universally recognized in the laws of civilized communities for centuries and is as old as equity. Its sentiment is ageless. *Domat, pt.* 2, *bk.* 1; *Code Nap.* 272; *Mackelday's Roman Law,* 530; *Coke's Littleton* 148–B; *Broom's Legal Maxims* (*9th ed.*) 197." What was said in *Whitney* was strongly approved by Chief Justice Vanderbilt in *Neiman v. Hurff,* 11 *N. J.* 55 (1952). *Cf.,* also, *Sorbello v. Mangino,* 108 *N. J. Eq.* 292 (*Ch.* 1931); *Swavely v. Prudential Insurance Co.,* 10 *N. J. Misc.* 1, 157 *A.* 394 (*Cir. Ct.* 1931) (murderer not permitted to collect insurance upon the life of his victim, although a beneficiary under the policy); *Sherman v. Weber,* 113 *N. J. Eq.* 451 (*Ch.* 1933).

The law is in some conflict as to the effect of intentional self-destruction by a sane insured, where the policy is payable to his estate but is silent on the subject of suicide. See 6 *Couch, Cyclopedia of Insurance Law*, § 1262a, *p.* 4612 (1930); 2 *Richards on Insurance* (5th ed. 1952), § 240, *p.* 824; 1 *Appleman, Insurance Law and Practice*, § 367, *p.* 440 (1941); *Vance on Insurance* (3d ed. 1951), § 94, *p.* 560; 29 *Am. Jur., Insurance*, § 913, *p.* 697 (1940); 45 *C. J. S. Insurance* § 843, *p.* 923. *In Ritter v. Mutual Life Ins. Co.*, 169 *U. S.* 139, 18 *S. Ct.* 300, 42 *L. Ed.* 693 (1898), the estate of an insured who took his own life while sane was denied recovery. Treating the policy as one silent on the question of suicide, the court based its decision essentially on two grounds: (1) in the absence of an express exception of suicide while sane in the insurance contract, such an exception must be implied; and (2) to permit payment in the circumstances would be against public policy. The force of the reasoning in *Ritter,* strongly supported by some decisions and by many *dicta* in English and American cases (see *Richards, Couch, Appleman* and *Vance, op. cit.,* and the House of Lords decision in *Beresford v. Royal Ins. Co., Ltd.,* [1938], 2 *All E. R.* 602, 54 *T. L. R.* 789, affirming the Court of Appeal, [1937] 2 *K. B.* 197, 2 *All E. R.* 243), was qualified by the United States Supreme Court in a brief opinion by Justice Holmes in *Northwestern Mutual Life Ins. Co. v. Johnson,* 254 *U. S.* 96, 41 *S. Ct.* 47, 65 *L. Ed.* 155 (1920), involving policy provisions—not "implied exceptions," he said, but "express undertakings" —not present in *Ritter* or in this case. Justice Holmes was careful to state that "The public policy with regard to such contracts is a matter for the states to decide." *Cf. Whitfield v. Aetna Life Ins. Co.,* 205 *U. S.* 489, 27 *S. Ct.* 578, 51 *L. Ed.* 895.

The court in *Campbell v. Supreme Conclave Improved Order Heptasophs,* 66 *N. J. L.* 274 (*E. & A.* 1901), undertook to criticize Justice Harlan's opinion in *Ritter v. Mutual Life Ins. Co.* at some length, and then went on to the

sweeping conclusion that "in no case should the suicide of an insured person defeat recovery upon a contract of life insurance not procured by him with the intention of committing suicide, unless the contract so provides in express terms." We consider this and much else of what was said in *Campbell* as extended *dictum,* altogether unnecessary to the decision. The situation in *Campbell* was not at all like that in *Ritter*. The court was not dealing with an attempted recovery by the estate of an insured suicide, but simply with a suit brought by an innocent third-party beneficiary seeking payment under a policy which was silent on the subject of suicide. We have remarked that in such circumstances almost every court allows recovery.

The *Campbell* decision may, perhaps, be better understood if we note that the majority of the court (the vote was 9–6) proceeded on Justice Collins' unfounded assumption that in New Jersey "neither suicide nor attempt to commit suicide has, since 1796 at least, been criminal." (66 *N. J. L.,* at *page* 283) We consider that assumption not only significant but critical, for the judicial mind did not then have to concern itself with any legislative expression of New Jersey's public policy against self-destruction. *Campbell* was decided in 1901; the Legislature had only three years before, in the 1898 general revision of the Crimes Act (*L.* 1898, *c.* 235, §§ 215 and 216, now *N. J. S.* 2*A*:85–1 and 5), insisted that offenses of an indictable nature at common law, not otherwise provided for by legislative act, continue to be punished as misdemeanors—and similarly attempts to commit such offenses. The erroneous *dictum* of *Campbell* was not overlooked in *State v. Carney,* 69 *N. J. L.* 478 (*Sup. Ct.* 1903), decided two years later, where our public policy on suicide and attempts at suicide was again made clear. We stress the error in *Campbell* because we consider the fact that New Jersey still looks upon attempted suicide as beyond the law important in establishing the weight which public policy must have in the decision of this case. The *Campbell* case was uncritically cited for the proposition just quoted in *Sautter v. Supreme Conclave, Improved Order of Hepta-*

*sophs,* 76 *N. J. L.* 763 (*E. & A.* 1908), but that case, too, dealt with recovery by a beneficiary.

Closer to our problem are those cases where the insured disabled himself in an attempt to commit suicide and then sought to recover under the disability provisions of his life insurance policy, the policy containing no express exception relative to disability caused by a suicide attempt. The Pennsylvania Supreme Court in *Elwood v. New England Mut. L. Ins. Co.,* 305 *Pa.* 505, 158 *A.* 257 (1931), and the New York Appellate Division in *Fanti v. Travelers Ins. Co.,* 264 *App. Div.* 724, 34 *N. Y. S.* 2d 34 (1942), denied the insured recovery of disability payments in such circumstances. Accord: *Bullas v. Empire L. Ins. Co.,* (1931) 4 *D. L. R.* 443 (*Ont. Sup. Ct.* 1931). The Supreme Court of Indiana reached a contrary result in *Prudential Ins. Co. of America v. Rice,* 222 *Ind.* 231, 52 *N. E.* 2d 624 (1944), but it is important to note that there was a strong differentiating factor present in that case, for the court particularly remarked that Indiana had no common law crimes and no statute declaring an attempt to commit suicide a public offense. Such was also the distinguishing feature of *Aetna Life Ins. Co. v. DuBarry,* 12 *F. Supp.* 664 (*D. Ct. Or.* 1935), where the court stated that suicide and self-mutilation were not crimes in the state where the policy took effect; neither had it there been declared to be contrary to public policy to permit an insured to quicken the payment of his disability policy by such means.

To attempt self-destruction has long been held to be an unlawful act in this State. This, and the strong support which our courts have given to the doctrine that no man shall be allowed to profit by his own wrong, attest to the continuing validity of a public policy which would deny the recovery of temporary disability benefits in this case.

Reversed, with direction that a judgment dismissing the claim for temporary disability benefits be entered.